Jane ANDRE, Plaintiff,

v.

The BENDIX CORPORATION, Defendant.

No. S 82–77.

United States District Court, N.D. Indiana, South Bend Division.

May 11, 1984.

Timothy J. Hartzer, Thomas J. Brunner, Jr., South Bend, Ind., for plaintiff.

Michael J. Stepanek, Jr., Robert T. Kenagy, South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

This case, filed March 1, 1982, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., was tried before the court in South Bend, Indiana, on February 28 and 29, 1984. It was a hard fought case with each party being represented by highly competent counsel. The plaintiff alleges discrimination based on sex in an individual case.

Jane Andre, a graduate of Ohio State University with a degree in Welding Engineering and an advanced degree in Electrical Engineering, as well as an MBA from the University of Idaho, had extensive experience in manufacturing as well as sales prior to 1978. (Tr. 17–21; Ex. 18, pp. 3–8).

This Memorandum and the findings and conclusions that are implicit herein is intended to comply with Rule 52 F.R.C.P.

### A.

Jane Andre's resume was sent in 1978 to the president and chairman of the board of Bendix. (Tr. 23–24). The resume was received by F.G. Cousins on May 31, 1978. Cousins was responsible for recruiting. (Tr. 118; Ex. 18, p. 3). Cousins routed the resume to A.E. Clark, who was Vice President and Group Executive, Aerospace Group, with the notation, "Any interest in a senior level female?" (Tr. 118–119; Ex. 18, p. 1). On or after June 5, 1978, Clark directed Jeanne Rideout, Director of Employee Relations at Bendix's Energy Controls Division at South Bend, and Ted Moore, Director of Operations, Energy Controls Division, to "Pls advise/interview." (Tr. 28, 117, 119, 148; Ex. 18, p. 1). As Moore described it, Clark, who was his boss's boss and a person whom he knew reasonbly well, called him on the telephone, told him of Andre's availability and qualifications and that the applicant had increased productivity over a short period of time. Moore responded to the description of Jane Andre with "I would like to meet that man." (Tr. 28–29; 149).

### B.

Richard Morrison, a personnel specialist who reported to Jeanne Rideout, requested that she interview for the position of Assistant Director. Andre responded by saying she was not looking for a token position. To make certain he understood the level of responsibility she was looking for she stated that her salary requirement was $40,000.00 per year. (Tr. 24).

Morrison later indicated that what Bendix really had in mind for her was to serve as an assistant to the director only in preparation for assuming the manufacturing manager's role four to six months down the line. (Tr. 24–25). She agreed to come to South Bend and interview. (Tr. 26–27).

In July 1978 Jane Andre was interviewed by Ted Moore and Jeanne Rideout, among others. (Tr. 27–30). In the interview with Moore, Moore began by telling how he had learned of Jane Andre's availability from the Vice President, Mr. Clark. (Tr. 28).

After Moore interviewed Jane Andre (the only one he had with her), Moore prepared a July 10, 1978 memorandum to his immediate supervisor, Alex Stefucza, General Manager of the Energy Controls Division (copy to Jeanne Rideout), reporting his interview of Jane Andre. (Tr. 150–51; Ex. 23). In the memorandum, Moore recommended that an offer be made "at the superintendent level" that would ... give an immediate opportunity to evaluate Mrs. Andre's capability to handle supervisory tasks." Moore also wrote that if Jane Andre was successful at that level, then promotion to a managerial slot could be available "within 18 to 24 months." Moore also wrote:

> Some risk is involved in this assignment, in my opinion, because there is no evidence on the record that Mrs. Andre possesses the necessary emotional stability to work in a direct supervisory capacity; however, her unique qualifications certainly make the risk worthwhile at the level suggested. (Ex. 23).

In the course of her conversation with Mr. Stefucza, Jane asked whether there was another candidate within the organization he could put in the Manufacturing Manager's position. Stefucza mentioned a Dale Franz who was interested in the position. Andre also asked if there were anyone in the organization who might feel they had been passed over for promotion should she be brought in. Stefucza responded "Well, it shouldn't be because no one here has the background that you have." (Tr. 42).[1]

In the interview Rideout mentioned that they had in mind bringing her in, not as an assistant to the Director, but, initially as a superintendent. (Tr. 33–34). Rideout said that the Assistant Director's position was "mundane", that Andre should find that the superintendent's position was where the action was—that was the position where she could show what she could do. (Tr. 34).

## C.

After the second set of interviews Morrison called Jane Andre and told her that an offer would be extended for one of two positions; one of the positions was Superintendent in the Energy Controls Division. Andre asked "Is the salary so high that there is no room for an increase when I assume the manufacturing manager's position". Morrison assured her that there was room for an increase. (Tr. 37).

On August 4, 1978, Bendix sent Andre a written offer of two positions, one of which was "Superintendent in the Manufacturing area" at a page rate of $2920.00 per month. (Ex. 1). In language which Rideout (who had approved and participated in preparing the offer) characterized as "unique" or "not normal" (Tr. 38–39, 120–22), the letter went on to speak of "logical progression":

> In consideration of the initial assignments and the salary proposed, the maximum within that grade range is $3110.00 per month. However, in looking at the logical progression, the next grade range would extend the maximum salary to $3775 per month. (Ex. 1).

According to Rideout Bendix offered the salary level it did "in order to attract a person of this caliber", and "... [W]e needed to outline what the next step would be. And in our opinion we felt she had the

---

**1.** According to Rideout, Jane Andre was one of four persons being considered to be one of two managers reporting to a Director-level individual in charge of the manufacturing operation in a proposed restructure of that operation. (Tr. 135–36). According to that restructure as reported by Rideout, Dale Franz, an employee at Bendix since 1948, was to fill the director's position. Dale Franz anticipated that he would move into the Director's level. (Tr. 137–38,

164). The plans for the restructure had been in existence for at least six months before Jane Andre was offered a position. (Tr. 138–39). According to Rideout, "... [I]t is embarrassing to indicate how long it takes to sell a program in a major corporation ...." (Tr. 139). "We were having some difficulty convincing our group management [to add a Director of Manufacturing]." (Tr. 138).

potential of going to that next level." (Tr. 121; *see also*, Tr. 136, 242–43, 250).

Prior to making the offer to Jane Andre, Rideout and other individuals made specific salary comparisons with other supervisors and with the salary that Franz was receiving. (Tr. 124). At the level of $2920, Jane Andre received anywhere from $700 to $1,075 per month more than her male peers who were General Supervisors and $80.00 per month less than her supervisor, Dale Franz, the Manager of Manufacturing. (Tr. 124, 169; Exh. 19, p. 4). Rideout was concerned about the salary differential between Jane Andre and her peers (all of whom were male). According to Rideout, there was an inequity but she had no problem with such a temporary inequity, "... as long as there is some plan for correcting it." Rideout's concern in Jane Andre's case was at least somewhat balanced by her view that Andre was only being placed in the position of superintendent temporarily for about six months. (Tr. 125–26).[2]

### D.

Jane Andre reported to work at Bendix on September 18, 1978. She first saw Mr. Morrison, who looked at her strangely and asked her if she had seen Ted Moore yet. When she said "No", Morrison said, "Well I think you better talk to him first." (Tr. 40–41). Moore showed Andre an organization chart drawn on his blackboard. It had Dale Franz in the Manufacturing Manager's position, with Jane Andre and others reporting to Franz. (Tr. 41–42; Exh. 19, p. 4).[3]

After showing her the chart on the blackboard, Moore stated that perhaps he would reorganize in about nine months during which Jane would have an opportunity to demonstrate what she could do.

During her conversation with Moore, Andre was not told what her specific duties would be or that she would be working as a "General Supervisor" rather than "Superintendent." (Tr. 42–43).

Andre was then taken down to Don Notary's office which was located just an office away from the General Supervisors' office. (Tr. 43–44). Notary introduced her to Bud Tyler, who at that point was a first shift general supervisor. (Ex. 19, p. 3; *see* Tr. 45; *see also* Ex. 15, p. 2). Tyler introduced Andre to various people. Helena Babich, the department clerk, showed her where she would be working in the General Supervisor's office. (Tr. 45, 167–68).

Andre had anticipated that as superintendent she would have a private office with her name on the door. (Tr. 40–41). Ms. Babich, according to Jane Andre, "... sat me down at Bud Tyler's desk [in the General Supervisor's office] and told me that would be my work place." Andre took her seriously. Thereafter Tyler came in, stood beside Jane Andre, asked her to get up and told her that was his work place. (Tr. 45). To Jane's request "Well, where is my desk?", Tyler did not know: "Nobody knew." (Tr. 45–46). Tyler then told her that she could have a straight chair located beside his desk. For a period of about three months thereafter Jane Andre worked without a desk. She kept her records in various manila envelopes on top of a bookcase in the general supervisor's office and did her desk work standing up, using the top of another bookcase. She did not have a telephone and her name was not

**2.** Rideout's concern was also ameliorated by the fact of Andre's education. None of the general supervisors had more than a high school education. (Tr. 134–35). As Rideout put it, ... Ms. Andre had extensive academic background. (Tr. 135).

**3.** The organizational structure at the time Jane Andre interviewed at Bendix had Don Notary in the Manufacturing Manager's position. (Tr. 32, 43; *see,* Tr. 166; Exh. 19, pp. 1–3). Franz at that time was Manager of Manufacturing Services, a position at the same level as, but covering a different area than, Notary's. (Tr. 164–66;

Exh. 19, p. 1). Sometime in the third quarter of 1978, in August or September, Franz was asked to take the position of Manager of Manufacturing in Manufacturing Services. (Tr. 165–66). He actually became Manufacturing Manager sometime before October 1, 1978. (Tr. 48; Exh. 19, p. 4).

At the time Jane Andre started with Bendix, Notary was still Manager of Manufacturing. (Tr. 166; Exh. 19, p. 3). Neither Notary nor Franz interviewed Andre. Franz had no part in interviewing or hiring Jane Andre. (Tr. 32, 165).

in the company directory through the date she was terminated. (Tr. 46, 167–68; Ex. 15, p. 3). Franz acknowledged that other (male) general supervisors had desks and chairs assigned to them and that "... there were parts of her responsibility that may have to have a desk...." (Tr. 168, 184; Ex. 19, p. 4).

In the course of a conversation and in response to her request for a description of her job duties and responsibilities Franz said that he did not believe in a set of duties and responsibilities. (Tr. 47–48).[4] However, as of October 1, 1978 Bendix instituted a management by objectives program, or "MBO". Jane Andre became aware of the program by attending a lecture by an outside consultant on the subject. She met with Franz about the program. Franz passed out a set of forms to be prepared by her as General Supervisor of Department 125 and also forms she was to deliver to her production supervisors. Then Franz gave Andre the first four objectives on the second page of her own MBO objectives. (Tr. 48–49, 192–93; Ex. 2, p. 2; *see also*, Ex. 15, p. 11). The four objectives were the following:

 Increase standard hour output to reach a total of 59,000 for FY....

 Improve quality in an effort to reduce rework.

 Improve housekeeping.

 Increase productivity to 48.8 on the average for 3 shifts combine[d]. (Exh. 2, p. 2).

After filling out the form, Jane Andre gave it to Franz; she never saw it again. Andre believed that the activities set forth in the MBO form were the basis against which her performance was to be measured. (Tr. 50).

Department 125 produced sensor-type parts: heat sensors, pressure sensors for fuel controls used in aircraft engines that formed a part of military weapons systems. (Tr. 251). During Jane Andre's tenure as Superintendent/General Supervisor Department 125 had approximately 87 em-

ployees, including five or six production supervisors. The production supervisors reported to Andre and they in turn directed the hourly work force. (Tr. 253, 261–62, 268).

Bendix, according to Jeanne Rideout, was a predominantly male environment, particularly in manufacturing. (Tr. 120). Of the five general supervisors reporting to Franz one was female (Jane Andre). Of the 35 production supervisors in Franz' organization, one was a female and she, Nancy Bailey, did not work in Department 125 from November 1978 to May, or June, 1979. (Tr. 268, 301–02; Exh. 19, pp. 4–5).

As Superintendent/General Supervisor in Department 125, Andre spent much of her time checking material that had been found discrepant, and defining problems in order to hand them to others to solve in order to prevent recurrence in the future. In that capacity Jane dealt with production supervisors and other people in the organization who had experience because she had no experience with the specific parts or similar discrepancies. Andre spoke on a daily basis with the quality engineer and an engineer in a group of engineers who worked on discrepant parts. (Tr. 54–56).

According to Robert Beall, who then was in charge of the salaried technical support people for Department 125, Jane Andre worked with him quite often. According to Beall,

> ... if there would be a problem with a particular procedure that would be running on the floor, either in the future or presently, she may come down and ask for assistance from myself or one of my employees. (Tr. 310–11).

Beall received many reports and requests (called "998's") from Andre—on the average, no less than one a day. (Tr. 317; *see also* Tr. 253, 310, 322–24). Other supervisors, such as Paul Luzney or Jack Loutzenheiser, did not ask for the kind of changes Jane Andre did. Beall did not believe they had as extensive training as Andre had. (Tr. 319).[5]

---

**4.** It was in this conversation that Franz also informed Andre that he was non-degreed and

had been promoted up from tool designer within Bendix. (Tr. 47).

**5.** Beall did not know that Jane Andre had a

### E.

Franz met with Jane Andre in January 1979 or thereabout to discuss performance and productivity in Department 125. Franz believed that he may have told Andre then that the Department was meeting its goals. (Tr. 177–78).

In early February 1979, Jane Andre was given a hand printed report of her performance to date. The report showed that the objectives set for increase in productivity on an annual basis had already been exceeded by one and a half times within the first quarter she was on the job. The report also showed that production output was slightly below the objective at that point, but Franz felt that output would be caught up quickly when a number of parts that had been tied up in the test area were made available. (Tr. 67; see, Tr. 256–57; Exh. A, p. 1; Exh. 15, p. 11). Franz requested Jane to convey the results to each of the production supervisors on the floor, personally. At that point Andre was under the impression that she was meeting her MBO objectives. (Tr. 67–68; Exh. 2, p. 2).

A computer report of Department 125's employee performance levels which recorded efficiency and productivity (Exh. 25), was favorable, according to Franz. (Tr. 178–80; see also, Tr. 220–21). The productivity figure in the report of 52% was 1.2% better than Jane Andre's fourth MBO objective dictated by Franz in the fall of 1978. (Tr. 49–50, 178–80; Exh. 2, p. 2; Exh. 25). That report was dated July 3, 1979. (Exh. 25). According to a report dated July 31, 1979, Department 125's performance was 9.2% better than what had been projected (Tr. 180). Another computer report, dated July 3, 1979, this time a weekly budget and expense report for Department 125, included a description of "losses, errors and defects" (generally referred to as "LED").[6] Included in the section for LED was a year to date budget allowance of $235,369. The actual LED generated by Department 125 up to July 3, 1979 was $111,403 with the result that Department 125 was under budget with respect to the LED allocated to it to the extent of $123,966. (Exh. 15, p. 17b; Tr. 269–71, 276–77).[7] At least one

---

degree in welding engineering. While he knew she had a background in theory and statistical analysis, he did not know how great her educational background was. (Tr. 318).

**6.** Scrap is one of the key components in the LED account. According to Franz it was true that there was a scrap build-up in Department 125 before Jane Andre arrived on the scene. (Tr. 271–72).

**7.** In Defendant's Exhibit A, which consisted of three undated handwritten sheets of paper, defendant attempted to show that standard hour output and LED for Department 125 were unfavorable—in Franz' terms "... output was a little under the goal and losses, errors, and defects was under the goal...." (Tr. 180, 255–56). Page 1 of Exhibit A does contain figures for standard hour output and does show that Department 125's output was, with four other departments, under the objective. However, that sheet purports to show only figures for the first quarter of fiscal year 1979, that is, October through December, 1978. (Exh. A, p. 1; compare, Exh. A, p. 2). Defendant offered no equivalent exhibit covering the balance of the fiscal year.

The figures for LED, which appear on the second page of Exhibit A, do purport to cover the entire fiscal year. They show that Department 125's LED element was favorable through-

out the year up to May. The figures turned unfavorable in May when the actual monthly LED figure was recorded as unusually high ($32,430 as compared with the average monthly LED through April of $14,164). The LED figures in Department 125 for June, the last full month in which Jane Andre worked for Bendix, was favorable (that is, below the monthly objective.) Through June, 1979, the net LED overage over Department 125's objective was $6766. By the end of the fiscal year (September 1979), the total LED overage for Department 125 (an unfavorable figure) had risen to $29,320, or $22,554 greater than what it had been in June, the last full month Jane Andre worked for Bendix. (Exh. A, p. 2; see, Tr. 257–59).

While Franz stated that an LED goal had been set for Department 125 early in the fiscal year, and that such goals were passed down to all general supervisors, he was not certain when the LED goals set forth in Exhibit A were given to Jane Andre. (Tr. 190–91, 278). The MBO objectives did not include a goal with respect to LED. (Exh. 2; Tr. 192–93).

The figures for LED on the computer sheet dated July 3, 1979 (Exh. 15, p. 17b) showed that Department 125 met the LED goals. In fact the department was under budget. (Tr. 279). According to Franz, the computer sheet (Exh. 15, p. 17b) was "an accounting budget," whereas the LED objectives in Exhibit A constituted "manufacturing goals." (Tr. 277).

production supervisor in Department 125, Zack Teeter, believed Jane Andre's performance helped in surpassing his shift's productivity goal. (Tr. 221).

The only demonstrated open negative reaction she received in the early part of her experience at Bendix was from Jack Loutzenheiser, who, with Paul Luzney, was one of the two first shift production supervisors. Loutzenheiser, then a 33 year veteran at Bendix, would shout at Andre and threaten to resign during the first two or three weeks she was there. (Tr. 57, 290, 295–96; Exh. 19, p. 4).

Paul Luzney had worked for Bendix for almost 32 years at the time of the trial. He had been in Department 125 for about 18 years as a production supervisor. Luzney discussed business and manufacturing problems with Jane Andre "to some small degree." (Tr. 280–81). Luzney recalled one occasion within the first two months where Andre instructed him "to deviate from the normal." Luzney made an effort to discuss why her approach was wrong, that it was not according to specifications. Andre did not accept Luzney's evaluation. In response Luzney followed the existing procedure as opposed to taking the directive from Jane Andre. (Tr. 282–83, 288).

Thereafter Luzney approached Ted Moore, who was two management levels above Andre (Exh. 19, pp. 1, 4), and spent some time with Moore in his office discussing the subject. Jane Andre was not present at the meeting. Luzney did not tell Andre that he was going to meet with Moore about the matter. (Tr. 284, 288). After that first incident, according to Luzney, "... I just decided to do the job right." Luzney did not mean by that statement that Jane Andre instructed him not to do the job right. As Luzney put it,

"Whether Jane's efforts were to improve or not, I couldn't say, but there were areas in which her approach was incorrect in my opinion." (Tr. 284). As to whether Andre listened to Luzney when he tried to discuss the situation as he saw it, Luzney said, "I will have to say after the first incident I didn't approach her any more." (Tr. 284).

According to Moore, he had, in his 30 years at Bendix as technician, supervisor and manager, come across many people whom he learned were credible and could be depended on. As Moore put it, "When they bring me an activity with regard to what happens in the shop, it is my tendency to factor that input and then to make a determination of whether I need to act on it." Moore received "input" from various people in the plant, apparently about Jane Andre. (Tr. 243–44). Several weeks later, according to Moore, he met with Jane Andre and discussed the input that he had received to the effect that Andre was unwilling to listen to her peers and colleagues. (Tr. 244–45).

Luzney for one did not appreciate the fact, as he saw it, that if Jane Andre had any dealings with personnel under his jurisdiction she would never come through him but would "always approach the individual." (Tr. 286; *see*, Tr. 288–89). Loutzenheiser also complained about Andre going directly to hourly personnel. He had no idea why she was doing so; according to Loutzenheiser "... I have no idea whether it was production, to make some kind of deal with them. I have no idea." (Tr. 290–92, 295). Loutzenheiser admitted that other supervisors, including Dale Franz, had done the same thing. (Tr. 291).[8]

Zack Teeter was the production supervisor on the third shift in Department 125.

---

8. According to Margaret Van De Velde, an employee at Bendix from 1934 to December 1979, and employed in Department 125 during Jane Andre's time there, Jane would come and talk to her about jobs and different kinds of work. She wanted to know what Mrs. Van De Velde was doing. Mrs. Van De Velde compared Andre's interest with other supervisors: "They just come and go and don't even know you are existing. But she would come up and ask you." (Tr. 198–99, 201–05).

Andre, according to Mrs. Van De Velde, was interested in suggestion. She was the first supervisor to give her the initiative to make a suggestion, for which she won a $25 check. As Mrs. Van De Velde put it, "... I would have put more [suggestions] in if she had kept on working there. But after that I lost interest." (Tr. 204–05).

At first Teeter did not get along with Jane Andre. He was leery of her and recalled a disagreement with her. Andre sent him a memorandum, or "AVO", in which she censured him for running a job wrong. In response Teeter proved that he had run the job correctly and that the routings and the prints did not correspond. Teeter went through Franz and another supervisor to get the [lack of correspondence] changed. There was a discussion in which Teeter and Andre had words. Teeter started to walk away. But Andre was persistent. As Teeter recalled,

> So when she was persistent, I decided that if she was this persistent she was trying to find out. And so then I began to talk to her after that to help her. I changed my opinion of her, in other words. (Tr. 216–18; *see also*, Tr. 226).

### F.

On September 27, 1978, Bud Tyler referred to her a grievance from a Lou Jacobs (Ex. 24) and stated that this time the company was wrong. (Ex. 15, p. 4; Tr. 51, 173). The grievance concerned the fact that a problematic, reworked, and apparently incomplete "Hot Set Up" machine had been operated by non-bargaining unit (salaried) employees and that under the contract hourly workers should be given pay for the items produced by the machine as operated by non-unit personnel. (Exs. 3, 24).

Tyler and Andre went down to Franz' office. Franz was in a meeting. Jane Andre excused herself and presented the grievance to Franz. Franz told her to give the grievance to Industrial Relations. Andre suggested that since nothing had been done to solve the problem on her level, if the union steward were given a promise date as to when the machine would be installed in the production area, he might accept such a date as a solution to the grievance. (Exh. 15, p. 4; Tr. 51).

In response to her suggestion Franz told Jane Andre to "See Mr. [Spier] for a promise date." Andre looked for Spier but he was not available. Feeling that it was an urgent situation, she went directly to Bud Mormon, the machine's designer. Between them, Mormon and Andre arrived at a promise date. Andre typed the company's Step Two response during lunch (Exh. 24) and took it to Franz' office. Since Franz was not there, she took it to Spier who felt the response was a good explanation. Before she could find Franz, the union steward, Chuck Miltonburger, approached her and asked what the decision was. Andre, having received Spier's opinion, felt it was appropriate to discuss the matter. After a discussion of the company's step two response, Miltonburger did not accept the decision and marked the grievance form "unsatisfactory." (Exh. 24). Andre then saw Tom Creevy of Industrial Relations and gave the form to him, telling him that he would have to take the matter from there. (Exh. 15, p. 4; Tr. 52).

At that point, while apparently still in the presence of Creevy and Miltonburger, Andre was called to the telephone. Franz asked her to leave the meeting to see him. Upon arriving at Franz' office Jane Andre explained that the steward had already checked "Unsatisfactory" on the grievance form and that it had been handed over to Industrial Relations. Thereafter Andre told Miltonburger that the meeting was over. (Exh. 15, pp. 4–5; Tr. 53).

Later, at about 3:30 in the afternoon, when the shift was over, Miltonburger and Lou Jacobs asked if they could meet with Andre on another matter. At that point they began to speak about a grievance over a laser welder that had been filed before Andre had joined Bendix. Andre explained that there was nothing she could do about that matter since it was already in the hands of Industrial Relations. Creevy joined the meeting momentarily and suggested the meeting break up since the "Hot Set Up" grievance had gone to Industrial Relations. Andre told him they were discussing something else on their own time. (Exh. 15, p. 5).

The next day Jane Andre met with Franz. Franz discussed with her the earlier grievance concerning the laser welder. Andre told Franz about the conversation in the previous afternoon concerning the

grievance over the laser welder and her response to the discussion. Franz instructed her that in the future she should refer written grievances directly to Industrial Relations which, thereafter, she did. (Exh. 15, p. 5).

According to Franz, Andre and Tyler came to his office with the grievance and Jane Andre asked him what to do about it. Franz told them to direct it to the Industrial Relations Department. According to Franz,

> And rather than doing that she proceeded to meet with the committeeman on her shift .... I asked her to take a recess at one time, and she continued to do so. (Tr. 262-63).

Moore's understanding was that Franz had asked Jane Andre not to answer the grievance. In a meeting among Franz, Moore and Andre either later that day (September 27 or 28) or a few days later (*Compare* Exh. 15, p. 5 *with*, Tr. 53-54), Andre, according to Moore,

> ... claimed ... that it had been too late when she got the message from Mr. Franz and, therefore, the answer had already been typed on the Grievance and handed to the involved Union Steward and, therefore, she could not be guilty of insubordination. (Tr. 157).

In the subsequent conversation Andre, according to Moore, repeatedly interrupted him as he was trying to make her understand why he felt the answering of Step Two grievance procedures was so critical, among other matters. (Tr. 157-58). Andre's interruptions angered Moore and he lost his temper. He told her to shut up. (Tr. 152, 158; *see also*, Tr. 53-54). According to Andre,

> Mr. Moore scolded me so hard that I was not given a chance to explain what happened and in what sequence the events took place. All I could squeeze in was that I first obtained permission to resolve this grievance from Mr. Franz, but I don't think that Mr. Moore heard this .... (Exh. 15, p. 5; *see also*, Tr. 53-54).

On or about October 9, 1978 Franz prepared a two page memorandum to Rideout on the subject of the grievance. (Exh. 3; contra, Exh. 15, pp. 4-5). The memorandum was "for record purposes and shall be placed in the personnel file of Jane Andre." (Exh. 3). Jane Andre did not receive a copy of the memorandum until March 21, 1978. (Tr. 50-51).

With respect to the grievance itself (Exh. 24) the Step Two response by the company did not accede to the relief demanded by the grievant but rather explained when the machine in question would be put into regular operation and the reasons therefor. Jane Andre, who was being paid a Superintendent's wages, signed the Step Two "Management Decision" in a box labeled "Superintendent." (Tr. 9, 173-74; *compare*, Tr. 136-37; Exh. 1). It appears from the grievance form (Exh. 24) that the union did not take the matter any further. Bud Tyler did not appear as a witness in this case.

### G.

Bendix had a policy that when people were requested to work eight hours on Saturday there would be no exceptions. In late January, 1979 one individual in Department 125 who had a family funeral requested an exception. Since apparently the exception was being denied (apparently by Loutzenheiser, *see*, Tr. 296-97), the entire first shift of Department 125 came to Franz's office complaining about the ruling. (Tr. 185-86; *see also*, 292-95). Jane Andre's involvement apparently stemmed from her allegedly calling Larry Graham, a minority group member, a fool. Franz made the incident the subject of a memorandum to the "J. Andre File." (Tr. 174-175, 185-87; Ex. 4).

According to Jane Andre, Larry Graham had come down from his work station inquiring whether early passes would be denied even in an emergency situation. By that time [Bendix management] had already determined that the hourly employee would receive an early pass [to attend the funeral]. Andre said to Graham, "The problem has been solved Larry. Go back to work." (Tr. 59; Exh. 15, p. 6).

As Andre was walking out of the department the union steward, Chuck Miltonburger, tried to press her to set policy such that Saturdays and Sundays would be treated as other work days as far as early passes were concerned. Andre refused on the ground that she did not set policy. Miltonburger then shouted at the top of his voice, "You know what I want you son of a bitch? Can't you hear?" (Exh. 15, p. 6; Tr. 58).

A few minutes later Franz asked Andre to come to his office. On the way he told her the steward (Miltonburger) had just staged a walkout by coming to his office with all the people in Department 125 behind him. With Creevy present in his office, Franz asked Andre if she called anybody any names. Andre told him she did not, that she was not a name caller. At that point, according to Jane, Franz "dismissed me from the meeting." (Exh. 15, p. 6; Tr. 57–58; see, Tr. 275).

Andre did not see Franz's January 29, 1979 memorandum (Exh. 4) until March 21, 1979. (Tr. 57). She described her reaction upon seeing the memorandum:

> When I was presented with a copy of the subject memo [Exh. 4] and found that he took hourly people's word above mine, I was shocked. And to put it in writing in my personnel file, shocked me all the more. (Exh. 15, p. 6).

After receiving Franz' memorandum in March, Andre spoke to both Graham and Miltonburger about the matter. Graham offered to tell Franz that he had misunderstood what Andre had told him. (Tr. 58–59; Exh. 15, p. 6).

Although in the memorandum (Exh. 4) Franz referred to an "inflammatory relationship between Ms. Andre and the hourly", he admitted that it was possible that the hourly workers could have been creating an inflammatory relationship. Franz did believe that hourly workers were challenging Jane Andre because she was new, because she was a woman and because there had never been a female General

Supervisor before. (Tr. 175–76). Andre said of Franz' memorandum: "Taking the word of an hourly person above that of a superintendent certainly puts a member of management in precarious position in dealings with the union ...." (Exh. 15, p. 6).

Chuck Miltonburger was subsequently voted out of his position of steward. (Tr. 82–83; see also, Tr. 272). Of the 80 to 84 employees spread over the three shifts in Department 125 Franz could name only Larry Graham as having problems or conflicts with Jane Andre. (Tr. 272).[9]

### H.

Bobby Dean was a vapor blast operator and union steward on the second shift. Cecil Bennet, who at the time of trial had worked for Bendix for 36 years, was production supervisor on the second shift. (Exh. 5; Tr. 305). Jane Andre and Mr. Barnhardt, the second shift superintendent, had both talked with Bennett about the fact that Dean had been walking over him and that he would have to stand up for management rights and put Dean in his place. (Tr. 60–61; Exh. 15, p. 8). In the course of a dispute over training on January 26, 1979, Dean refused to return to work and Bennett discharged him for insubordination. (Exh. 5; Tr. 308).

The next morning when Jane Andre came to work, she learned that Dean had been discharged. The following day, January 27, 1979, when she came to work she saw from the computer tapes that Dean had worked the previous shift. (Tr. 61; Exh. 5, p. 2). Andre had not been told by either Bennett or by Industrial Relations that after the discharge Industrial Relations had allowed Dean back on the job. (Exh. 15, p. 8; Tr. 62; 263–64; see, Tr. 308–09).

Andre was angry with Bennett. She thought he had fired Dean one night and let him come back the next night. It was difficult to talk with Bennett personally about it since his shift began when Andre's

---

**9.** Franz did refer to the entire first shift coming to his office "... one day that was a problem resulting from that." (Tr. 272–73).

was ending, she wrote a note or AVO and left it on the corner of her desk where she normally left notes and materials for him. (Tr. 61–62, 306; Exh. 5, p. 2; Exh. 15, p. 8).

When Andre saw Bennett the next day coming into work she walked down the aisle with him. Bennett then informed her that Creevy of Industrial Relations had let Dean go back to work. Jane Andre then apologized to Bennett for not having that information when she wrote the memo. (Tr. 62).

On February 5, 1979 Franz wrote a memorandum on Jane Andre's note to Bennett to Rideout. (Exh. 5, p. 1). In the memorandum Franz reported,

> I discussed the AVO with Cecil and informed him that I do not support or agree with actions as indicated on the attached AVO.
>
> I have not discussed the situation with Ms. Andre. (Exh. 5, p. 1).

Franz never did speak with or communicate in any way with Jane Andre about the incident. Andre first saw Franz's memorandum on March 21, 1979. (Tr. 60, 62; see, Exh. 15, p. 8).

### I.

On February 6, 1979 Franz wrote a memorandum to the "J. Andre File" concerning an attempted call by the principal of La-Salle High School to a second shift employee in Department 125 to discuss a pressing problem." As Franz recorded it, "The call was taken ... by Ms. Andre who questioned the emergency status of the ... call." (Exh. 6).

According to Andre everyone had left the office at the end of the first shift when the principal called. She asked the principal if the call concerned an emergency. The principal said it did not. She asked the principal if she would like the employee to be brought to the telephone. The principal said "No, you don't need to do that." Andre then took a message from the principal for the employee: "... when she gets off work have her phone me." (Tr. 63). Andre also wrote the AVO to Bennett which

was attached to Franz' memorandum. (Tr. 63–64; Exh. 6).

The next day Creevy, who had obtained the AVO, called Jane into his office. The employee was upset about the matter. Apparently Bennett had not relayed the message appropriately. Andre then spoke with the employee personally, gave her the telephone number in another department that was manned on the second shift and advised her to give that number for emergency purposes. The employee said there certainly was a lack of communication and expressed her appreciation that Jane gave her the emergency number. (Tr. 63–64; Exh. 15, p. 9).

Jane Andre first saw a copy of Franz's February 6 memorandum (Exh. 6) on March 21, 1979. (Tr. 62–63).

### J.

On or about February 16, 1979 Franz prepared another memorandum, a "situation report", "to be placed in the record of Ms. J. Andre." (Exh. 7). According to Franz, Bobby Dean's right hand was broken and placed in a cast. Thereafter Dean and the union committee asked Franz to allow Dean to return to work on the vapor blaster. Franz did not allow Dean to work on the vapor blaster because, apparently, it was a two handed operation. Dean and the others made the same request of Moore and received the same answer. (Exh. 7).

The next day Franz learned that Jane Andre had allowed Dean to return to work. Franz questioned Dr. McMeel about the case and reported that he had been told by the doctor that Dean had been given strict orders that he could return to work only if the job was one handed. Toward the end of his memorandum Franz wrote, "I advised Ms. Andre that ... I expected her to issue a pass and send Mr. Dean home until he returns with a doctors statement." (Exh. 7).

Jane Andre did not see the February 16 memorandum (Exh. 7) until March 21, 1979. (Tr. 64–65).

According to Andre she knew nothing of Bobby Dean's broken hand until he walked into her office at noon on February 14th. Dean claimed that he could work with the injured hand if Jane arranged with the first shift's supervisor to have parts to be cleaned by him be deposited in a basket so that he could conduct his work with one hand. Andre told him that if he felt he could still do a good job with one hand, and provided the arrangement proposed could be done, it was acceptable to her if he worked. (Tr. 65; Exh. 15, p. 10). At that point Jane Andre did not know that Dean had approached Franz and Moore on the subject. (Tr. 65–66; Exh. 15, p. 10). As Andre put it, "Mr. Franz did not consult with me or inform me of happenings." (Exh. 15, p. 10).

Dean thereafter spoke with Loutzenheiser on the first shift and arranged for assemblies that Dean could work on. The same day (before Dean had begun to work) Franz called Andre to his office. Franz mentioned Dean's approaches to him and Moore for the first time and asked her if she thought it was wise to let Dean work under the circumstances. Andre thought a doctor should make that decision. Franz told her that if Dean came to work he must have a doctor's slip permitting him to work. When Dean came to work he had a doctor's slip, gave it to Bennett, his supervisor and worked the full shift. (Tr. 66; see, Exh. 15, p. 10).

The next day, February 15, after Dean had demonstrated 85% productivity, Franz told Andre he had spoken to the doctor and that the doctor said Dean was not to work with the injured hand and he was to be sent home. As Andre described it, the following took place when Dean reported to work:

> When Mr. Dean came to work we discussed this and Mr. Dean decided to phone the doctor. Then Mr. Dean turned

the phone over to me. The doctor told me when I inquired why Dean couldn't work that he thought it was Franz who didn't want him to work, and therefore the doctor decided that Dean shouldn't work. (Exh. 15, p. 10).

## K.

Moore had a meeting with Jane Andre on March 2, 1979. Moore began by speaking in generalities in an attempt to convince her that she had a "people problem." Moore said he was getting negative feedback from various people in the organization. Andre inquired who was saying what. Moore did not give her any specific facts. (Tr. 69).

Moore suggested that Jane change her image. He said "Try rolling back the [production] figures." (Tr. 70; see, Tr. 152–53, 245–46). Moore also recommended that she try playing "dumb." He did not explain what he meant by the statements. (Tr. 70).[10]

On March 6, 1979, Franz wrote by hand a "Performance Status of Three Month Employee." (Ex. 8; Tr. 176–77). There was nothing positive about Jane Andre in Franz' report. It was "100% negative." (Tr. 68, 177). Productivity and output in Department 125 was not the problem. Productivity had soared. At the end of the first quarter it was already one and a half times the annual objective. (Tr. 74–75; see also, pp. 10–11, 13–15, infra).

According to Franz, the form he used to record the three month evaluation (Exh. 8) "had nothing to do with management by objectives" (MBO). It was "... used for feedback at some point in the early time of a new employee." Franz never gave the report to Jane Andre. He never asked her to respond to the memorandum. (Tr. 176–77).

---

**10.** Also in the meeting, Moore showed Andre the January 27 memo to Bennett (Ex. 5, p. 2) and suggested she attend sensitivity training workshop. (Tr. 70–71). Moore suggested that the memo to Bennett demonstrated a lack of sensitivity. Jane responded by saying, "I think it shows more that I was angry with Cecil Bennett." (Tr. 71). Andre did attend a sensitivity workshop held in Georgia in May. (Tr. 71, 79).

Among other statements in the Franz memorandum (Exh. 8) were the following:

"Ms. Andre had not demonstrated technical abilities related to the special processes in Dept. 125."

"her salary is out of line with her performance and level of responsibility."

"incorrigible."

Andre responded to the memorandum in detail (Exh. 15, pp. 11–12) in which, among other matters, she addressed its assertion that she had taken too much time off. Part of the time off "... was with prior approval of Mr. Franz in exchange for the many hours of overtime I was putting in staying late and coming in some Saturdays ..." (Exh. 15, p. 12). In addition to responding to Franz' assertion that she lacked "technical abilities" (Exh. 15, p. 11), she described in detail her abilities to communicate (another criticism) (Exh. 15, pp. 11–12), and said of Franz' statement, "She lacks the ability to manage....", "How can you argue with success?" (Exh. 15, p. 11).

On March 12, 1979, Moore wrote a four page memorandum to Rideout about Jane Andre, recording in the process various criticisms of Jane's performance. (Exh. 9; *contra,* Exh. 15, pp. 13–15).[11] The memorandum was also used by Moore as a vehicle to give to Jane Andre the various memoranda Franz had been writing since the preceding October. (Tr. 154). Andre received Franz' memos at a meeting between her and Moore on March 21, 1979.

After looking over the memoranda Andre asked Moore, "Would you like to hear my side?" Moore shouted, "No." Then, in a low voice Moore said, "But you do have the right to put your rebuttal in writing." As he ushered Jane out of his office he said, "However, I am prepared to take depositions if necessary." (Tr. 72). Jane Andre interpreted Moore's statement about depositions to the effect that if she did prepare written rebuttals, she would be fired. (Tr. 72–73). She thought about how she might

respond to the memoranda. Instead of preparing rebuttals, on March 27, 1979, she submitted a memorandum to Moore, copies to Rideout and Franz. (Exh. 10; Tr. 74). In the memorandum Andre stated she would prepare but not submit rebuttals "... unless it absolutely becomes necessary to defend myself." Andre went on to say, "This is because a defensive attitude on my part at this time would be unwise and not in our best interest." Later in the memorandum Jane offered a "deal" with Moore and Franz:

If I manage to improve my image in you and Mr. Franz' eyes by first year's anniversary (or any other date you wish to set), will you be good enough to discard all of those memos you put in my personnel file?" (Exh. 10).

Moore did not accept Andre's proposal. He did not speak directly to Jane. He wrote a memorandum. In his March 30, 1979 memorandum, in addition to denying her request, Moore repeated the statement "... both Dale Franz and I are seriously concerned about your ability to perform as a supervisor both from the technical aspects and the human relations aspects of the job." (Ex. 11; *contra,* Ex. 15, p. 17; see, Tr. 78–79).

### L.

From the end of March to July 1979, things were going smoothly in Department 125. Productivity continued over and above the annual objectives set for the department. Relations with hourly workers were quiet. (Tr. 82–83; Tr. 335–36). Andre had no problems with supervisors.

On June 15, 1979 Bendix issued a memorandum on the subject of "appropriate clothing and footwear." (Ex. 14). The memorandum was primarily concerned with footwear. The final paragraph discussed clothing:

---

**11.** Rideout never spoke with Jane Andre about the problems discussed in various memoranda she had received from Franz and Moore until July 16, 1979, three days after Jane had been terminated. (Tr. 126).

... "[A]ppropriate clothing" excludes jogging or basketball type shorts. Walking shorts which reach to the knee are permitted on those jobs which do not require full leg protection.

The memorandum said nothing about shirts, tops, blouses or upper body exposure. (Tr. 181). No meeting was called to distribute the memorandum or to explain it. (Tr. 90). Luzney, who worked in an air conditioned office, believed there was a policy that prohibited people from wearing garments that exposed their upper chest, shoulders and back. According to Luzney, the rule was to wear a short sleeved shirt, cut at the elbow, not up at the shoulder. (Tr. 286–87). Bailey thought the same thing, although she was not certain when the policy was enunciated. (Tr. 298–99, 303–04). Franz thought that appropriate dress in Department 125 was a matter of judgment. He preferred that supervisors, both male and female, wear a short sleeved open throated shirt; his preference was to have a uniform dress. (Tr. 183–84).

In mid July, on hot days the temperature in the plant easily reached 100 degrees or more. It was even hotter than that in the general supervisors' office because of lack of circulation of air. Windows in the Department 125 area were shut in connection with energy savings. (Tr. 87–88, 206, 221–22). Jane Andre had arranged to have two large fans placed in Department 125 to help the workers due to the heat. According to Mrs. Van De Velde the fans just blew a lot of hot air. (Tr. 88, 206). During the first or second week in July Jane Andre purchased three blouses similar to what were worn by other females in the plant. She did so because she could not stand the heat and humidity that had developed the week before she wore the new clothing. (Tr. 89).

Hourly workers at Bendix wore shirts or blouses which left their arms and shoulders exposed. The typical wear was tank tops which were worn by both men and women. (Tr. 91, 207–08, 222–23, 228–30). Moore described an hourly individual in Department 125 who was a "long and relatively stable and sincere employee", "who always wanted to wear an undershirt ... from the first ... greening of the leaves in the spring until the turning of the leaves in the fall ...." (Tr. 160). Moore went on to admit, "We had other ladies in the plant who wore tank tops...." (Tr. 160). Male supervisors wore short sleeved shirts. Supervisors were observed to wear shorts at the plant on Saturdays. (Tr. 92, 114, 184, 207–08, 223–24, 303).

On July 12, 1979 Jane Andre wore one of the three blouses she had purchased. It included rope straps a quarter inch in width over each shoulder and hung down like a sack to the hips. (Tr. 92, 299). At approximately 8:00 or 8:30 a.m. Franz asked Jane Andre to meet him in his office. At that point the temperature in the plant was 89 degrees. In the meeting Franz said, "Your dress does not conform to the dress code." Andre replied that her dress was in conformity with the code, that the code only defined what should be worn in the way of shorts and shoes. Franz then said, "Well, considering especially that an hourly employee complained about your attire I think that it is in bad taste." (Tr. 92–93, 94). When Jane referred to the fact that people in Southern California came to work in shorts and halters, Franz said, "Well, if that is the way you want to dress, then go to work in southern California." (Tr. 93).

Franz requested Andre to go home and change out of the blouse. In response Jane stated that her dress was not substantially different from what people in the hot environment upstairs [12] were wearing and said, "I think this is ridiculous, but I will go home and change to a tank top." Andre did so and returned to work in what was typically considered a tank top. (Tr. 94).

The next day, July 13, 1979, Jane Andre went to work in a blouse similar to the one she had changed into the previous day, but for the fact that the straps were a little

12. Franz's office, which was located in the basement, was air conditioned. (Tr. 90–91, 182–83).

narrower. It had a round neckline and was sleeveless and collarless. (Tr. 95). At about 8:30 in the morning Franz came to her office and asked her to go downstairs. When they arrived at his office Franz said, "Yesterday I asked you to go home and change your top. And today I am going to ask you again." Jane pointed out that "What I am wearing is ... a tank top for ladies." Andre asked Franz to define what he considered appropriate. In response Franz said, "Well, I think it is inappropriate for the position you are in." (Tr. 95–96). Franz refused to define what he felt was appropriate, at which point Andre said, "If you could define for me what you consider appropriate, then I won't feel like I am being singled out while everybody else could be wearing this." (Tr. 97).

Franz commented that safety factors called for different dress. When he asked Andre whether she thought people in Department 125 working around hot equipment should be wearing tank tops, she responded by stating that that question was for the safety engineer to rule on. In that context Jane said,

> If the safety engineer feels this is [a] safety problem, then let's have him put the recommendations in writing. And if he wants to outlaw tank tops in Department 125 then nobody is going to wear them, not just me. (Tr. 98).

Andre then got up and said, "The action I am going to take is to call the safety engineer." (Tr. 98, 181–82). Andre did not say she would not go home and change and Franz did not accuse her of insubordination either then or before that point. (Tr. 98–99, 182).

Jane Andre called Dick Wyatt who had joined Bendix in May 1979 as Manager of Health and Safety. Wyatt was within Rideout's jurisdiction. (Tr. 99–100, 129–30, 325). She asked him to come over and look at her attire because Mr. Franz thought it violated the safety code. Wyatt came over and looked at what she was wearing. According to Jane, Wyatt said, "There is no problem with what you are wearing. It conforms to the dress code." Andre responded, "Well Mr. Franz has a different opinion," to which Wyatt said, "Well, I will go and talk to Franz." Wyatt agreed to contact her after he had spoken to Franz. (Tr. 99–100).[13]

According to Franz, he thought of discharging Jane Andre for insubordination for the first time when he saw her at work after lunch on the 13th. Franz described his reaction as, "She has defied a directive that I have given her and ... she is insubordinate." (Tr. 100, 267, 276; *see also*, Tr. 155).

Upon seeing Andre, Franz asked her to go downstairs to his office. As Jane began stepping toward Franz to go to his office, a woman wearing a blouse similar to what she had worn the previous day walked in front of her. (Tr. 100–101).

Jane went to Franz' office and waited for him. Meanwhile Franz asked the Captain of the guards to meet him at the guardhouse and accompany him to the office. When Franz came to the office he had two

---

**13.** Wyatt recalled that Andre called him on the morning of July 13; that she wanted a statement of the specific policy on dress, that she asked him to come and talk to her, that he did so and that he did view her attire. (Tr. 325–26). According to Wyatt, although he was of the opinion that Jane Andre's dress was not appropriate for an industrial environment and although he orally informed Jane what the code was, he made no comment to Jane on the acceptability of her dress. Rather, he went back to his office and had the policy he had received from Rideout (Exh. 14) retyped. Wyatt, who saw Franz after his meeting with Jane, intended to go back and talk to Jane and "indicate my opinion." According to Wyatt, Jane Andre did not ask him to comment on or in any way approve or disapprove of what she was wearing. (Tr. 326, 329, 331–32). Exhibit 20 was a copy of the dress policy Wyatt had retyped on July 13 and which he intended to give to Jane Andre. The July 13 dress code contained a portion of the June 15 code. (Exh. 14). The July 13 document did not refer to shirts, blouses or upper body coverage. (Tr. 129–31, 330). Wyatt never did see Jane Andre after his meeting with her in the morning. (Tr. 100).

guards with him.[14] Franz sat down and said, "Now I asked you to go home and change your top. And since you didn't I am discharging you for insubordination.[15] Hand over your badge." (Tr. 101, 183). Before turning in her badge Jane asked Franz if Moore knew that he was discharging her. Franz said, "Yes" and that Moore had no objection to the discharge. (Tr. 102).

After Jane gave Franz her badge, Franz instructed her to take her personal possessions out of her desk and "get out of the plant." Franz and the guards accompanied her to her office and the guards escorted her out of the plant in front of other workers. As Andre described it, "Everyone saw us marching out the door." (Tr. 103).

Bendix had a policy relating to separation of salaried employees. (Exh. 21; Tr. 131). The policy, which was in effect on July 13, 1979 and which applied to Jane Andre, provided that employees being separated should be given reasonable notice ranging from two weeks to ninety days. (Exh. 21, pp. 5; Tr. 132).[16]

When Rideout learned of Jane Andre's termination she was much concerned. She disagreed with the way Franz handled the firing and expressed her displeasure to him. According to the normal procedure, Franz would discuss the situation with her first and would bring the individual to her office before termination. In Rideout's opinion, the use of uniformed guards to escort Jane Andre out of the door was wholly unnecessary. She would like to have had an opportunity to handle it in a more sensitive manner. (Tr. 126–28, 141).

Later in the day on July 13, Moore and Rideout discussed Jane Andre's situation. They decided to change the termination to a suspension. Neither Rideout nor Moore told Jane about the change in status. (Tr. 104, 105, 128–29, 156, 247).[17]

About 3:15 p.m. on July 13, Jane Andre reached Rideout by telephone. Rideout invited her to come to her office on Monday morning (July 16). (Tr. 104). In the meantime on the afternoon of July 13, Rideout and Moore discussed the advisability of a separation committee. The separation committee that resulted consisted of Moore, Rideout and W.J. Kuhns, a longtime employee of Bendix. (Tr. 132, 141–42, 247–48).[18]

At the meeting between Jane Andre and Rideout on July 16, Andre gave Rideout a memorandum containing her rebuttals to the various memoranda by Franz and Moore. (Exh. 15). Rideout told her that a committee would be formed to review the memorandum. (Tr. 105). The committee met on July 18, and reviewed Andre's personnel file and her memorandum. The committee did not feel it was necessary to discuss the matter with her personally. (Tr. 106, 132–33, 142, 248).

Meanwhile, as a result of Jane Andre's request for a written statement by Bendix

---

**14.** According to Franz it was unusual for him to have uniformed security guards with him when he fired Jane Andre. In Andre's opinion she had done nothing that might cause Franz to be concerned about his security. (Tr. 103, 183).

**15.** Jane Andre did not consider herself insubordinate. She had been waiting for word from the safety engineer. (Tr. 102).

**16.** Deviations from the policy were provided for, but, according to the policy, they required, "... the advance approval of the General Manager and the Vice President, Corporate Organization and Human Resources." (Exh. 21, p. 6; *compare*, Tr. 143).

**17.** The first time Jane Andre learned of the change from termination to suspension was in a

fact finding conference after she filed a charge of discrimination. (Tr. 106).

**18.** According to Moore, "... I tried very hard to enter the committee with as open a mind as possible...." Moore also stated he had "... very strong feelings about the ability of our company to rehabilitate this individual...." (Tr. 248). Along with her concern about the way Jane was terminated, Rideout "... felt that a better approach to the situation was that she did not perform the full area of her responsibility rather than to identify the dress situation at that particular time." (Tr. 141).

of the reasons why she had been terminated, Andre met with Rideout and a Tom Moon, who was the Equal Employment Manager, on July 20. At the meeting Jane was handed a letter formally advising her of her separation effective July 13. (Exh. 16). The letter went on, "This action is taken based upon your inabilities to perform the duties of your position." The letter said nothing about insubordination. (Ex. 16; Tr. 106–08).

The reason given in the July 20 letter surprised Andre. She asked, "How can you say that when my performance to the MBO objectives greatly exceeded the expectations?" Rideout said, "There are other criteria to appraise one's performance outside of the MBO objectives." Andre asked Rideout to tell her what those criteria were. Rideout did not do so. Neither Rideout nor Moon gave Andre any specific reason for the conclusion that she was unable to perform her duties. Andre did not receive anything else explaining the reason for her firing. (Tr. 106–08).

Rideout wrote and signed the report of the separation committee on August 13, 1979. That document (Exh. 22) did contain reasons for Jane Andre's termination in addition to "inability to perform the duties of her position." They included, "Ms. Andre did not possess the necessary people skills;" she was not "making progress in her day to day supervision of her subordinates;" "[S]he lacked good judgment in her relationship with subordinates and supervisors;" and finally, "[h]er past welding experience in structural welding and circuit board soldering was lacking on our specific application." *The report did not mention insubordination.* (Exh. 22; Tr. 133).

Zack Teeter was surprised in some respects that Jane Andre was fired and what she was fired for. In other respects he was not surprised. As Teeter put it, " . . . [T]here was a lot of animosity in that place about her, and it started from the day she came in there. And a lot of them never changed their opinion." (Tr. 225–26).

Mrs. Van De Velde was surprised that Andre was fired for inability to perform her duties. Based on her observation of Jane Andre's work, Mrs. Van De Velde did not agree that she was unable to perform her duties. Teeter was of the same opinion. (Tr. 211–12, 225–26; *see also*, Tr. 203–05).

Bud Tyler, a male, replaced Jane Andre as General Supervisor of Department 125. (Tr. 226). According to Zack Teeter, Bendix tried to enforce the dress code after Jane Andre's termination, but never very successfully. The effort by supervisors in Department 125 to enforce the dress code became, in Teeter's words, "pretty lax." The laxity in enforcement started not too long after Jane was fired: "a month, maybe two months." (Tr. 230–31; *see*, Tr. 209–11). Jane Andre filed a charge of sex discrimination in employment with the South Bend Human Rights Commission shortly after the termination. (Tr. 108–09; Exh. 17).

Andre sought employment after her discharge from Bendix. She obtained the position of Director of Manufacturing at GENAVE in Indianapolis for approximately six months until she was laid-off due to lack of work. During that period she earned close to $20,000. (Tr. 109). Other than the position with GENAVE, Andre had, by the time of trial, received no income other than the proceeds from some income property. (Tr. 111).

Andre did try to obtain employment and otherwise earn money. She sent approximately 7000 resumes and business cards which produced about fourteen telephone calls and four interviews. Jane Andre also contacted numerous employment agencies. She attempted to start a consulting practice, but that venture did not succeed. At the time of trial she and her husband were in the second month of a one-tractor trucking business. So far the firm had operated at a loss. (Tr. 109–111, 116).

When she worked at Bendix Jane received an income of $2920 per month or

$35,040 per year. (Tr. 121–22; Exh. 19, p. 4). According to Rideout, based on performance, the percentage of salary increase from 1978 through the date of trial could vary as much as 6% to 12% per year, or less or more than a year's period. The 6% to 12% figures were not a total for the period 1978–84. (Tr. 124, 133–34). Striking an average of 9% increases per year, with an anniversary date of September 18, 1979, Jane Andre's lost wages, not including interest, amount to the following:

| Period | Rate | Total | Set-off | Cumulative Total |
|---|---|---|---|---|
| 7/14/79 – 9/17/79 | $2,920 | $ 5,840 | $ –0– | $ 5,840 |
| 9/18/79 – 9/17/80 | 3,183 | 38,196 | 20,000 | 18,196 |
| 9/18/80 – 9/17/81 | 3,469 | 41,628 | –0– | 59,824 |
| 9/18/81 – 9/17/82 | 3,781 | 45,372 | –0– | 105,196 |
| 9/18/82 – 9/17/83 | 4,121 | 49,452 | –0– | 154,648 |
| 9/18/83 – 4/17/84 | 4,492 | 31,444 | –0– | 186,092 |

## II.

The burden of proof in most employment discrimination cases are governed by the Supreme Court's decisions in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 and *U.S. Postal Service Bd. of Governors v. Aikens* (1983) 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403. *See also, Furnco Construction Corp. v. Waters* (1978) 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957. In the court's most recent opinion on the burden of proof in a Title VII case, Justice Rehnquist presented an overview that applies to this case:

All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult. The prohibitions against discrimination contained in the Civil Rights Act of 1964 reflect an important national policy. There will seldom be "eye witness" testimony as to the employer's mental processes. But none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact. Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern "the allocation of burdens and order of presentation of proof," (Citation omitted), in deciding this ultimate question. 103 S.Ct. at 1482.

Justice Rehnquist also dealt with the inherently mental aspect of discriminatory intent:

The law often obliges finders of fact to inquire into a person's state of mind. As Lord Justice Bowen said in treating this problem in an action for misrepresentation nearly a century ago:

"The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else." *Eddington v. Fitzmaurice*, 29 Ch.Div. 459, 483 (1885). *Id.* at 1483.

The specific holding in Aikens was that the plaintiff need not, in order to establish a *prima facie* case present "direct evidence of discriminatory intent" and that the trial court in that case erred by focusing "on the question of *prima facie* case rather than directly on the question of discrimination." *Id.; see also Id.* at 1481 and n. 3. Since *Aikens* provides a helpful gloss on *McDonnell Douglas* and *Burdine*, it will be discussed further after the evidentiary formulae of those cases are considered.

*McDonnell Douglas Corp. v. Green, supra,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, was a failure to hire case (although in the context of an earlier discharge). The Court held that the plaintiff must establish a *prima facie* case that the employment decision he complains of constituted prohib-

ited discrimination. If the plaintiff establishes such a case, as the Court put it, "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." 411 U.S. at 802, 93 S.Ct. at 1824.

If the employer is found to articulate such a legitimate, non-discriminatory reason, the employee,

> ... must ... be afforded a fair opportunity to show that [the employer's] stated reason for respondent's rejection was in fact pretextual. *Id.* at 804, 93 S.Ct. at 1825.

The court suggested that the following factors relevant to the case at bar would bear on the question of pretext: the employer's treatment of the employee prior to the alleged discriminatory event; the employer's general policy and practice with respect to employment of the discriminatee's class; and statistics bearing upon whether a general pattern of discrimination exists. As the court summed up its position on proof of pretext:

> In short ... [the employee] must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for [the adverse decision] were in fact a coverup for a ... discriminatory decision. *Id.* at 805, 93 S.Ct. at 1826.

After lower courts had wrestled with *McDonnell Douglas'* shifting burdens and presumptions for a number of years, the court clarified its position on evidentiary matters in *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. *Burdine* involved alleged sex discrimination in the context of a discharge that followed a failure to promote. At the district court level the court found that no discrimination had occurred. On appeal, the district court's decision on promotion was upheld on the basis that the male who received the promotion had been implicitly found to be better qualified. The court reversed the decision where the discharge was concerned.

The appellate court's decision on this aspect of the case was based on its previous holdings that when a *McDonnell Douglas prima facie* case is presented by the employee, the employer must prove by a preponderance of the evidence, among other matters, "the existence of legitimate nondiscriminatory reasons for the employment action" and that the employer had not sustained its burden in that case. 450 U.S. at 251–52, 101 S.Ct. at 1092–93.

The specific holding of the Supreme Court in *Burdine* of concern here was that the allocation of the employer of the burden of persuasion of nondiscrimination was incorrect. *Id.,* at 256–58, 101 S.Ct. at 1095–96. What the Court said in the course of reaching that conclusion is obviously important to the case at bar. The court first emphasized that "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.,* at 253, 101 S.Ct. at 1093. The Court also said in the context of the promotion aspect of the case,

> The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.... As the Court explained in *Furnco Construction Co. v. Waters [supra ]*, the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact

remains in the case. (Footnote omitted.) *Id.*, at 254, 101 S.Ct. at 1094.

The Court then described what the employer must do to rebut the presumption created by the *prima facie* case. The employer need not establish that its decision, adverse to the employee, was in fact not discriminatory. Rather, its evidence need only raise a genuine issue of fact. The Court then described what was necessary to create a genuine issue of fact:

> To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. (Footnotes omitted.) *Id.* at 255, 101 S.Ct. at 1094.

In a footnote directly applicable to this case, the Court stressed that an employer's rebuttal of the presumption established in the employee's *prima facie* case does not destroy the value of the evidence presented in support of that *prima facie* case:

> In saying that the presumption drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case .... [T]his evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation. *Id.*

In order to rebut the presumption created by the employee's *prima facie* case, however, the employer must fulfill certain requirements:

> Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the

action and to frame the factual issue *with sufficient clarity* so that the plaintiff will have a full and fair opportunity to demonstrate pretext. (Emphasis added.) *Id.*, at 255–56, 101 S.Ct. at 1094–95.

Later in its opinion the Court in *Burdine* accented the quality of evidence the employer must produce in order to rebut the presumption: "... [A]s noted above, the defendant's explanation of its legitimate reasons must be clear and reasonably specific." *Id.*, at 258, 101 S.Ct. at 1096.

Finally, if the employer manages to rebut the *prima facie* case, the employee's overall burden of persuasion that she was discriminated against may nevertheless be sustained,

> ... either directly by persuading the court that a discriminatory reason more likely motivated the employer [than the reasons the employer advanced] or indirectly by showing that the employer's proffered explanation is unworthy of credence. (Citation omitted.) *Id.*, at 256, 101 S.Ct. at 1095.

The final point in *Burdine* was echoed by the majority in *Aikens*, 460 U.S. at ——, 103 S.Ct. at 1482, and in Justice Blackmun's concurring opinion:

> This ultimate burden [of plaintiff] may be met in one of two ways. First, ... a plaintiff may persuade the court that the employment decision more likely than not was motivated by a discriminatory reason. (Citation omitted) In addition, however, this burden is also carried if the plaintiff shows "that the employer's proffered explanation is unworthy of credence." (citations omitted) ... [T]he *McDonnell Douglas* framework requires that a plaintiff prevail when at the third stage of a Title VII trial he demonstrates that the legitimate, nondiscriminatory reason given by the employer is in fact not the true reason for the employment decision. *Id.* at 1483.

The reasoning and result here announced is well supported, most recently, by *West-*

*inghouse Electric Corp. v. Vaughn,* —— U.S. ——, 104 S.Ct. 2163, 80 L.Ed.2d 531, dismissing grant of certiorari which lets stand the underlying case found at 620 F.2d 655 (8th Cir.1980).

From the day in May 1978 when Cousins circulated Jane Andre's resume with the question, "Any interest in a senior level female?" Bendix committed acts of discrimination. Cousins did not treat Jane Andre as a job applicant like any other.

It was clear that Bendix treated Jane Andre differently from other job applicants in that it made several statements concerning her advancement to a position higher than the Superintendent level within a relatively short period of time, approximately four to six months after she arrived. (Facts, 6–8). The "era of good feelings" created during Bendix's process of acquiring Jane Andre as an employee changed upon her arrival at the scene.

When Jane Andre arrived at Bendix she was first met by Mr. Morrison who advised her to meet with Mr. Moore immediately. It was only in her initial meeting with Moore that Jane learned of the corporate reshuffle that resulted in what she thought to be her competitor, Mr. Franz, being placed in the Manufacturing Manger's position. (Facts, 8). It was on her first day of work that Jane Andre discovered that, while she had been sought after by Bendix because of her education and background, no one had thought to make arrangements for her to have her own desk or telephone, not to mention her own office. (Facts, 9–10). The importance of Jane Andre being compelled for the next three months to work in the General Supervisor's office without desk, using manila envelopes for her records and tops of bookcases for working surfaces (Facts 9–10), cannot be discounted. It is a concrete demonstration of managerial unhappiness that Jane Andre had even come to the Energy Controls Division.

The network of Moore, Franz, Rideout, Luzney, Loutzenheiser and others appears to have been created over approximately 30 years at Bendix. Andre was an outsider, a female, one who exceeded all of the individuals referred to by the level of her education and the breadth of her experience. Upon her arrival at Bendix, in addition to learning that she would not even have a desk or a telephone, in the succeeding days she learned that she was not to be addressed as a Superintendent but rather as one of several "General Supervisors," the balance of whom were male and none of whom had anywhere near her level of education. (Facts, 5, 7 & n. 2). In that context, Andre's *de facto* demotion, her lack of an office, the appearance created by her being forced to stand to perform her office work and the appearance of her not even having a telephone in her own name (Jane Andre never did have a telephone or even a number in the telephone book (Facts, 9–10)), were "unsubtle" signs to the workers in Department 125 and elsewhere that higher management would not support this individual.

The succeeding months demonstrated that Jane Andre's efforts to achieve productivity in Department 125 would be minimized and undercut by actions of long-term male employees of Bendix both below and above her. Consistent with his initial one-interview evaluation, Moore treated Andre as difficult to get alone with as early as within two weeks of her beginning to work at Bendix. In the context of resolving a minor union grievance, Moore supported Franz's escalation of the incident into a major brouhaha, one marked by miscommunication and noncommunication on the part of Moore and Franz. (Facts, 18–22). It should also be borne in mind that Jane Andre, as Franz's subordinate, was making only $80.00 a month less than Franz himself was. Franz acknowledged that he was surprised at Andre's salary. Franz also acknowledged that other supervisors were upset by the amount Andre was being paid, a figure substantially greater than that of every other General Supervisor in the group reporting to Franz. As Zack Teeter said, Jane Andre was faced with widespread animosity and suspicion from the day she arrived at Bendix. (Facts, 15).

The impression that Luzney, Loutzenheiser and Bennet had the freedom either to yell at Jane Andre (Facts, 15–16) or to go to her superiors in her absence (Facts, 16–17, 25) appears in retrospect to have been the result of an effort, calculated or not, to reduce Jane Andre's ability to deal effectively with those reporting to her. This acceptance by higher management of insubordination raises an inference of bias against Jane Andre at the beginning of her time at Bendix. That inference is corroborated by Franz's secretive acts of filling Jane Andre's personnel file with adverse, unrebutted memoranda as early as October 9, 1978, less than a month after she arrived. (Facts, 20–21, 22–23, 25, 26, 27, 30–31).

Those actions, insofar as they are documented by Franz's *ex parte* memoranda, should be carefully weighed in terms of Jane Andre's necessarily belated, but nonetheless detailed, rebuttals. (Ex. 15). A comparison of Franz's memoranda and his explanations for them, when compared with Jane Andre's responses both at trial and in her rebuttal, demonstrate a refusal by Franz to deal with Jane Andre as a colleague. Franz accepted the word of hourly employees without fairly giving Jane Andre a chance to respond to an accusation that she called Larry Graham a fool. (Facts, 23). Franz instructed Dr. McMeel to declare Bobby Dean incapable of operating the vapor blaster when, as a matter of fact, Dean had demonstrated that he could do the work at an acceptable level of productivity. (Facts, 28).

Franz's conduct is most clearly demonstrated by his handwritten "Three Month Employee" evaluation dated March 6, 1979. As Franz admitted, there was nothing positive in it. (Facts 29, 30). There is no recognition that Department 125 at that point was achieving its productivity goal and indeed was even fulfilling the "LED" goal which did not form a part of the MBO objectives and which may never even have been communicated to Jane Andre at all. (Facts, 13–15 & n. 7).

From the evidence presented it appears that part of Franz's and Moore's dislike of Jane Andre stemmed from the fact that she could respond to their criticisms and demonstrate that their own perceptions were incorrect. (Facts, 18–22, 31; Ex. 15). That hostility, demonstrated throughout her tenure at Bendix, is established by the way Jane Andre was terminated.

It is undisputed that Bendix's operation in the vicinity of Department 125 was extremely hot. It is also clear that employees in Department 125 and elsewhere, both men and women, wore extremely light clothing (tank tops and the like). (Facts, 33–34). The alleged dress code on which Bendix relied to terminate Jane Andre on July 13 said nothing with respect to upper body coverage of any sort. As amended by Mr. Wyatt on the very day of her termination the "dress code" still said nothing about upper body coverage. (Facts, 32–33, 36; Exs. 14, 20). Yet Franz chose to construe the blouses Jane Andre wore on July 12 and 13 as the basis for a charge of direct insubordination. That charge was based upon his ruling that such attire was inappropriate. Franz's edict could not be based on the "dress code" because the "code" did not deal with "upper body coverage" in any way. (Facts, 32, 36 & n. 13). It was apparently based on Franz's preference that Jane Andre dress as the other male supervisors. (Facts 33). Franz's demand is suspect both for its substance and also for its apparent motivation. It is clear that Franz used Jane's alleged refusal to follow his directive as a means of ejecting her from Bendix.

On the other hand, it must be emphasized that Andre's reaction to Franz's directive was based upon her perception that the directive itself was discriminatorily aimed at her and her alone. She had good reason for believing so since other women in the plant wore what she was wearing. When Franz was required to fall back on a safety argument with respect to his dress requirements, Jane's request that the safety engineer be requested to render a decision as to the propriety of clothing in Department 125 was based on good business

judgment, since if she was in danger then others in Department 125 were. (Facts, 35–56).

As a further example of his hostility towards Jane Andre, Franz felt it necessary (even though he himself acknowledged that it was an unusual thing to do) to have two Bendix guards come to his office and escort Jane Andre out of the plant in front of her fellow workers. (Facts, 37). Even Rideout felt more than a little concern about how Franz effected the termination. It is clear in retrospect, however, that Rideout's concern had little to do with Jane Andre and much to do with her apparently sophisticated understanding of Bendix's potential liability due to the way it had dealt with its "senior level female." (Facts, 38, 39 & n. 18).

As Justice Blackmun pointed out in his concurring opinion in *Aikens*, if the reasons proffered by the employer for the adverse decision are shown to be pretextual, that itself is evidence that supports a conclusion of discrimination. One gathers the impression that the removal of Jane Andre from the plant with her uniformed escort became widely known in a very short period of time. That afternoon Rideout registered her concern with Franz about how Jane Andre was expelled. That afternoon Rideout and Moore had a conversation. Between the two of them they decided to change the termination to a "suspension." (Facts, 38).

Between the 13th and the 20th, Bendix decided to change the grounds of Jane Andre's termination from "insubordination" to "inabilities to perform the duties of your position." (Facts, 39–40; Ex. 16). When pressed by Jane Andre in a meeting on July 20 to give specific reasons for the statement, "inabilities to perform the duties of your position", Rideout was unable to give any. *See, Aikens, supra*, 103 S.Ct. at 1482, 1483.

The "separation committee" that was formed by Rideout did finally state a series of reasons for the termination, but those reasons did not appear until August 13, 1979, in a document Jane Andre never saw.

(Facts, 40; Ex. 22). The reasons so belatedly presented ring hollow and are of most doubtful credibility.

The assertions of Jane's lack of capacity to manage, the shifting of grounds for her termination (a process not complete even through trial, since insubordination was reasserted as a basis for her termination), raised by themselves the impression of pretext. To be compared with Bendix's assertions are Mrs. Van De Velde's and Mr. Teeter's recollections of Jane's performance. The record demonstrates that, under Jane Andre's supervision, Department 125 was efficient and productive. (Facts, 13–15, 40–41). Based on the foregoing, the facts in this case show that Jane Andre was the victim of knowing and systematic sex discrimination.

As Justice Rehnquist stated in *Aikens*, Title VII cases are not easy to develop. Justice Rehnquist said, "There will seldom be 'eye-witness' testimony as to the employer's mental processes." 460 U.S. at ——, 103 S.Ct. at 1482. Discrimination must be discerned by patterns, by attitudes reflected under various circumstances. The pattern of conduct in this case is more than sufficient to support the conclusions that Bendix discriminated against Jane Andre because of her sex, that Bendix's proffered reasons for Jane Andre's termination were pretextual, and that the nature of those shifting explanations is itself weighty corroboration of the conclusion of sex discrimination.

With respect to remedies, Jane Andre requests lost wages which are set forth here. It is reasonable and appropriate for the court to order, in addition to the lost wages, that Jane Andre be reinstated to a position consistent with the level of responsibility and income she was receiving at the time of her termination.

Based upon the foregoing, Jane Andre is entitled to lost wages in the amount of $186,092 and reinstatement.

SO ORDERED.