**Jane ANDRE, Plaintiff-Appellee,**

v.

**The BENDIX CORPORATION,
Defendant-Appellant.**

**No. 84–2296.**

United States Court of Appeals,
Seventh Circuit.

Argued April 23, 1985.

Decided Oct. 3, 1985.

Rehearing and Rehearing En Banc
Denied Nov. 22, 1985.

Lawrence C. DiNardo, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellant.

John C. Hamilton, Parker, Brunner & Hamilton, South Bend, Ind., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and TIMBERS, Senior Circuit Judge.[*]

CUDAHY, Circuit Judge.

Plaintiff Jane Andre was hired by defendant The Bendix Corporation for a supervisory position in its Energy Controls Division in South Bend, Indiana, at least in part on the basis of her sex. She was fired within a year, and brought this Title VII action alleging that the termination was also on the basis of her sex. After a bench trial, the district court found that Andre had been fired on account of her sex, and awarded her $186,092 in lost wages as well as ordering that she be reinstated. 584 F.Supp. 1485 (N.D.Ind.1984). Bendix appeals, raising two issues: first, that the evidence was insufficient to support a finding of intentional sex discrimination, and second, that the district court violated Rule 52(a) of the Federal Rules of Civil Procedure by adopting, virtually verbatim, An-

[*] The Honorable William H. Timbers, Senior Circuit Judge for the Second Circuit, is sitting by designation.

dre's post-trial brief as its decision. This is a hard case. If we were sitting as triers of fact, we would certainly have difficulty finding that Andre had been discriminated against on account of her sex. However, the different question now before us is whether the finding of the district court that there was discrimination is clearly erroneous. In that respect, because we are unable to follow the reasoning of the district court, and are unable to affirm the district court finding of sex discrimination on the grounds it gives, we vacate the judgment of the district court and remand for a new trial.

## I.

In the early part of 1978 Andre sent her resume to a very large number of manufacturing corporations, including Bendix. At Bendix, her resume was eventually routed from F.G. Cousins, who was responsible for recruiting, to A.E. Clark, Vice President and Group Executive of the Aerospace Group, with a notation "Any interest in a senior level female?" Pl. Ex. 18. Clark called Ted Moore, Director of Operations for the Energy Control Division, and described Andre's qualifications, apparently in gender-neutral terms. Moore responded "I'd like to meet that man," and was corrected by Clark. Moore continued to show interest, and Andre was invited to South Bend for interviews twice.

After his interview with Andre, Moore wrote a memo to his immediate superior, Alex Stefucza, General Manager of the Energy Controls Division, with a copy to Jeanne Rideout, Director of Employee Relations at the Energy Controls Division, concerning his impressions. Pl. Ex. 23. He found Andre's academic background and technical understanding impressive. However her work experience was exclusively in staff or support positions. He felt she lacked experience supervising a large number of employees or managing a production line. He also felt he observed a defensiveness in Andre in her attribution of the rejection of her proposals in prior employment to her sex and not to the merit of the proposals. Moore proposed, however, that Andre be hired at the Superintendent level where she would get manufacturing supervisory experience and her supervisory abilities could be evaluated. If those were found adequate she could be promoted within 18–24 months to a managerial position in manufacturing. However, Moore conceded that there was some risk to his proposal. In an apparent reference to what could be described as the large number and short tenure of the jobs in Andre's employment history, he found there was no evidence in the record that she had the "necessary emotional stability" to work as a supervisor.

Eventually an offer of two jobs was extended to Andre. She accepted the position of Superintendent in the Manufacturing area of the Energy Controls Division. Pl. Ex. 1. She was offered a salary of $2920 per month, and told that the maximum in the grade level was $3110 per month, and in the next logical progression was $3775 per month. Consistent with Moore's proposal, Andre understood that the offered position was in part a trial for 4–6 months before she would be considered for a manufacturing managerial position. She understood that the salary she would be receiving was very high for a superintendent's position but also that some increase could be available if she moved to a managerial position. She also understood that the position was "up or out," for there would be "no place else to go" if things did not work out. Finally, and probably most important, it was clear to Andre that the division had been undergoing reorganization. The various local players were trying to create two manufacturing managerial positions, one of which (at the "Director" level) was intended for Dale Franz, who at that time was Manager of Manufacturing Services, and the other of which (at the "Manager" level) would be open for Andre, but the national headquarters had not yet approved the reorganization. Andre further understood that should she move up to a managerial position it could be resented by longtime employees, especially those who would also

be candidates for the position. *See* Pl. Ex. 15, pp. 1–2.

Andre started working at Bendix on September 18, 1978. When she arrived a reorganization had been temporarily completed, but without the creation of a second managerial position in manufacturing. Dale Franz had been laterally transferred to the single Manufacturing Manager position.[1] Andre was placed as a "General Supervisor," apparently functionally equivalent to a superintendent. She was subordinate to Franz. She was told there would be another reorganization in about 9 months, and she would have a chance to prove herself as a supervisor until that time.

During Andre's tenure she was involved in a number of incidents in the factory. These events included a dispute over the proper handling of a union grievance only two weeks after Andre started work; a dispute in January 1979 over the issuing of a pass to an hourly worker who wished to be excused from weekend overtime work; a dispute over a reprimand to one of the shift supervisors reporting to Andre, also in January; disputes in February over the proper handling of a phone call to a hourly production worker and over whether an injured worker was able to operate his usual machine; and disputes over proper methods for running and evaluating procedures in Department 125, the department supervised by Andre. After each of these incidents, and at other times, Franz wrote memoranda to Andre's file detailing what he found inadequate or inappropriate in her handling of the situations. Bendix claims these and other incidents show Andre was unable to function as a supervisor. She

claims they show Bendix was out to get her because of her sex. We think they show some sort of conflict between Franz and Andre.[2]

In January 1979 Franz met with Andre to discuss performance and productivity in Department 125. He may have told Andre that the department was meeting its goals. In early February Andre was given a hand-printed report of the department's productivity. Def. Ex. A. The report showed that the objectives set for increasing productivity had been met, but that production output was slightly below the objective at that point. Franz apparently felt that output could be caught up quickly, and requested Andre to convey the results to each of her production supervisors.

Moore met with Andre on March 2, 1979. He spoke in general language to the effect that she had a "people problem" and that he was getting negative feedback from people in the department, but would not elaborate. He showed Andre a memo she had written to a production supervisor subordinate to her, and said it showed a lack of sensitivity. The memo had been written without a full knowledge of the relevant facts (as Andre now admits) and accused the supervisor of "needing a shot of male hormones." Pl. Ex. 5, p. 2. Andre said that the memo showed she was angry, not insensitive, but acceded to Moore's suggestion that she attend a sensitivity training workshop, which she did (at Bendix's expense) in May. Moore also suggested that Andre try to change her image, perhaps by rolling back the production figures or "playing dumb."

---

**1.** At the time Andre interviewed with Bendix, Don Notary held the position of Manufacturing Manager. Franz at that time held the position of Manager of Manufacturing Services, a position at the same level as, but covering a different area than Notary's position. Notary managed production while Franz managed the technical and engineering staff which assisted production workers in solving various problems. When Andre started with Bendix in September, Notary was still Manager of Manufacturing, but Franz had already been asked to take the position of Manager of Manufacturing, and

did so before October 1, 1978. Pl. Ex. 19; *see* 584 F.Supp. at 1488 n. 3.

Neither Notary nor Franz interviewed Andre. Franz had no part in interviewing or hiring Andre. 584 F.Supp. at 1488 n. 3.

**2.** The district court adopted much of Andre's versions of the these events in its statement of facts, §§ F–J, 584 F.Supp. at 1492–96, but only relied on some of them in its analysis supporting its finding of sex discrimination, 584 F.Supp. at 1505–07. We discuss the district court's analysis, including the events it relied on, in Part III A of this opinion.

Franz completed a three-month evaluation of Andre on March 6, 1979, almost six months after she had started work. Pl. Ex. 8. The report was negative. It stated that she had not demonstrated technical abilities related to the Department 125 processes, that her salary was out of line with her performance and level of responsibility, and that she was incorrigible. Franz did not show the report to Andre or allow her to respond, but sent the report to her file.

Moore wrote a memorandum about Andre to Rideout on March 12, 1979, recording various criticisms of her performance. Pl. Ex. 9. Moore used the memorandum as a cover to transmit to Andre the several memoranda Franz had written and placed in her file. Moore gave Andre the memoranda at a meeting between them on March 21, 1979. Moore said he did not want to hear Andre's side of the story, but told her she had the right to file written rebuttals, though apparently in a tone of voice Andre claims led her to believe that she would be fired if she did prepare rebuttals.

Andre did prepare a memorandum in response to the meeting. Pl. Ex. 10. The memorandum was addressed to Moore, with both Franz and Rideout receiving copies. In her memorandum Andre recognized the difficulty "in trying to acclimate a female from a predominately development environment to one of production," and that she had been "working hard since last week's meeting to improve the situation with respect to acceptance of myself by my peers, subordinates, the union representatives, and the hourly personnel." She thought that if she succeeded in doing that, her acceptance by Moore and Franz would improve. She said she had looked at herself in the mirror and objectively made "a critical analysis in an effort to draw conclusions and then make recommendations to myself about ways in which I can improve and grow professionally in my experience with Bendix."

The memorandum also explained that Andre would not at that time submit a detailed rebuttal to the memoranda in her file. Instead, she would type up a rebuttal which she would hold onto "unless it absolutely becomes necessary to defend myself." She also proposed a deal to Moore: "If I manage to improve my image in your and Mr. Franz's eyes by my first year's anniversary (or any other date you wish to set), will you be good enough to discard all of those memos you put in my personal file?"

Moore responded with another memorandum. Pl. Ex. 11. This memorandum reiterated that he and Franz were seriously concerned about Andre's supervisory ability "both from the technical aspects and the human relations aspects of the job," and that Andre had a right to dispute the data in the file and to rebut it. The memorandum also stated that the company had arranged to send Andre to "developmental training in the human skills which seem to be lacking." Finally Moore stated he was unable to go along with Andre's request to remove material from her file if her performance improved. He did agree to "add material to the file showing improved performance if, indeed, this occurs. This subsequent information would show the necessary improvement and override the previous information which has been placed in the file."

On July 12, 1979, Andre wore a tank top with double one quarter inch rope shoulder straps to work. Franz told her it was unacceptable because it violated the dress code, and sent her home to change. She went home and changed into a tank top with a round neckline and cloth straps over the shoulders. Neither Franz nor Andre saw the other the rest of that day. The following day Andre wore a tank top with a round neckline and spaghetti straps over the shoulders. Franz called Andre into his office, and an argument ensued. Andre's basic position was that the top did not violate the dress code because hourly workers were allowed to wear such clothes. Franz claimed the top violated the dress code because supervisors were supposed to wear short sleeved shirts with collars, and that the top was unsafe. He ordered her to change. Andre left to get the opinion of

Dick Wyatt, the Manager of Health and Safety. She says she would have changed if the safety manager said there was a problem, but he did not.[3] Later that day Franz called Andre, who was still wearing the same top, back to his office and fired her for insubordination. He had two security guards march her out of the factory.

The Bendix personnel department changed the summary termination to a suspension and convened a review committee. The committee received a twenty-one page memorandum from Andre in rebuttal to the memoranda in her personnel file, Pl. Ex. 15, but upheld the discharge on grounds of "inabilities to perform the duties of your position." Pl. Ex. 16.

On August 14, 1979, Andre filed timely charges of sex discrimination with the Equal Employment Opportunity Commission (the "EEOC") (charge number 053791964), App. 131, and the South Bend Human Rights Commission (the "SBHRC") (charge number 79–63), App. 129. After submission of extensive documentation by Andre, a fact-finding conference and a full investigation by the SBHRC staff, the SBHRC concluded that there was insufficient evidence to find probable cause that discrimination had occurred. App. 132–40.[4] Andre appealed this ruling to the full SBHRC which, after a hearing, found that Andre had presented no evidence that she was discharged because of her sex or treated differently because of her sex, and affirmed the earlier findings. App. 142–45. Shortly thereafter the EEOC concluded that there was no reasonable cause to believe that Andre's charge of sex discrimination was true, and issued its notice of right to sue. App. 146. The EEOC gave substantial weight to the findings of the SBHRC.

Andre commenced this litigation with a timely complaint in the District Court of the Northern District of Indiana, South Bend Division. A bench trial was held on February 27 and 28, 1984. *Cf.* 584 F.Supp. at 1486 (erroneously stating trial held Feb. 28 & 29). At the close of the day and a half trial the district court ordered both parties to submit proposed findings of fact and conclusions of law. The court also ordered Andre's counsel to submit a petition for attorney's fees.

On May 11, 1984, the district court issued its Memorandum and Order. 584 F.Supp. 1485. This was four days after Bendix submitted its post-trial brief and proposed findings of fact and conclusions of law, which totaled some 44 pages, and 28 days after Andre submitted her post-trial brief with its proposed findings of fact and conclusions of law. The district court's order essentially adopted—"photocopied" would more accurately describe the process—Andre's post-trial brief, though numerous changes were made. The district court ruled that Bendix had unlawfully discharged Andre because of her sex, and awarded $186,092 in back pay as well as reinstatement. In a separate order of the same date the court awarded $28,000 in attorney's fees and $3,389.49 in costs. App. 57–61. Judgment was entered and Bendix perfected a timely appeal. As noted, the two issues on appeal are whether the district court's finding that Andre was discharged on account of her sex is clearly erroneous, and whether the district court's wholesale adoption of Andre's proposed findings of fact and conclusions of law as its own violated Rule 52(a) of the Federal Rules of Civil Procedure.

## II.

There can be little dispute in this case over the proper burden of proof below or standard of review in this court. The burden of proving that the defendant intentionally discriminated against the plaintiff

---

**3.** Wyatt's testimony tends to support Franz's version of the incident. The district court was obviously aware of the conflict in testimony, *see* 584 F.Supp. at 1499 & n. 13., but did not explicitly resolve it, and did not rely on what Wyatt may or may not have said in its analysis supporting its finding of sex discrimination, *see id.* at 1506–07.

**4.** Indeed, the SBHRC concluded that Andre's documentation verified Bendix's stated reasons for her discharge. App. 139.

remains at all times with the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The rules governing the burdens of production and order of proof in a Title VII case alleging discriminatory treatment are more complex, though not difficult to understand. The plaintiff begins her case with the burden of making out by a preponderance of the evidence a prima facie case of discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093. After the plaintiff has established a prima facie case, the burden is on the defendant to produce evidence of a "legitimate, nondiscriminatory reason for the employee's" termination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. This is not a burden of persuasion but rather a burden of production. If the defendant's evidence raises a genuine issue of fact, the presumption created by the plaintiff's prima facie showing drops from the case. *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094. The plaintiff then has the opportunity to show that the alleged reason was pretextual. The burden of showing this merges with the ultimate burden of showing that the defendant intentionally discriminated against the plaintiff. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. A plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id. See, generally, United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Bellissimo v. Westinghouse Electric Corp.,* 764 F.2d 175, 179–80 (3d Cir.1985) (Wisdom, J.); *Coates v. Johnson & Johnson,* 756 F.2d 524, 531 (7th Cir.1985); *Parker v. Board of School Commissioners,* 729 F.2d 524, 526 (7th Cir.1984); *Nellis v. Brown*

*County,* 722 F.2d 853, 856 (7th Cir.1983); *Lee v. National Can Corp.,* 699 F.2d 932, 935–37 (7th Cir.), *cert. denied,* 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983).

The framework established by these rules "requires that a plaintiff prevail when at the third stage of a Title VII trial he demonstrates that the legitimate nondiscriminatory reason given by the employer is in fact not the true reason for the employment decision." *Aikens,* 460 U.S. at 718, 103 S.Ct. at 1483 (Blackmun, J., concurring). Of course, since the plaintiff at all times retains the ultimate burden of persuasion, she must present some evidence by which the finding of sex discrimination can be supported.

■■■ If a case is fully tried on the merits, and the employer produces evidence of a legitimate nondiscriminatory reason for its action, neither the district court nor the reviewing court should concentrate on the issue of whether the plaintiff has established a prima facie case. *Aikens,* 460 U.S. at 714–15, 103 S.Ct. at 1481.

> Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff."

*Aikens,* 450 U.S. at 715, 103 S.Ct. at 1482 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).[5] *See Suson v. Zenith Radio Corp.,* 763 F.2d 304, 307 (7th Cir.1985); *McCluney v. Jos. Schlitz Brewing Co.,* 728 F.2d 924, 927 (7th Cir.1984). Whether the defendant intentionally discriminated against the plaintiff is, of course, the ultimate factual inquiry in a Title VII case. *Aikens,* 450 U.S. at 715, 103 S.Ct. at 1482; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *Parker v. Board of School Commissioners,* 729 F.2d at 526. The court must con-

---

**5.** It is for this reason that Bendix's argument that Andre failed to establish a prima facie case of intentional sex discrimination, Bendix Br. at 27–32, is beside the point. Of course, we have considered the points Bendix makes in its argument insofar as they support its relevant argument that the district court's finding of sex discrimination is clearly erroneous.

sider the defendant's evidence that the action was motivated by a legitimate nondiscriminatory reason and the plaintiff's evidence that that reason is a pretext, and "must decide which party's explanation of the employer's motivation it believes." *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482. The plaintiff, of course, bears the burden of persuasion. *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482; *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

In reviewing a Title VII discrimination case, the general rule is that the court of appeals is bound by Rule 52 of the Federal Rules of Civil Procedure to accept the district court's findings of fact unless they are clearly erroneous. *Parker v. Board of School Commissioners*, 729 F.2d at 527; *Nellis v. Brown County*, 722 F.2d at 859. This includes the ultimate factual issue in a Title VII case, the finding of intentional discrimination. *Anderson v. City of Bessemer City*, 470 U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).[6] Of course, the district court's findings must themselves be sufficient to satisfy the requirements of Rule 52. *See Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 370 (7th Cir. 1984); *Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1183–84 (7th Cir. 1982); *Denofre v. Transportation Insurance Rating Bureau*, 532 F.2d 43, 45 (7th Cir.1976) (per curiam).

In *Anderson* the Supreme Court considered a case where the court of appeals had failed to give proper deference to the district court's finding of discrimination. The Court went to some lengths to explain the meaning of the clearly erroneous standard.

> Although the meaning of the phrase "clearly erroneous" is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles ... is that "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

> This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts....

> ....

> When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility

---

6. Bendix argues that because the district court adopted substantial portions of Andre's post-trial brief in its decision, its findings should be given a "more critical" reading on appeal. Andre agrees that this is appropriate. Andre Br. at

39, 49–50. We have done so, though we are still bound by the clearly erroneous standard. *Coates v. Johnson & Johnson*, 756 F.2d 524, 533 n. 7 (7th Cir.1985).

determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Anderson v. City of Bessemer City,* 470 U.S. at ——, 105 S.Ct. at 1511–13 (citations omitted).

With these principles in mind, we now turn to an examination of the district court's finding that Andre was fired because of her sex.

### III.

■ Bendix challenges a number of the factual findings upon which the district court predicated its ultimate finding of sex discrimination. We will consider these in turn.

### A.

1. The district court found that Cousins did not treat Andre "as a job applicant like any other." 584 F.Supp. at 1505. Bendix concedes that this is true, but claims this cannot support a finding of sex discrimination. We agree. Andre was treated more favorably in the hiring process because of her sex. For instance, she was offered a salary $720–1075 more than the other second level supervisors, and was told she would be under consideration for advancement to a managerial position after 4–6 months. On the other hand, she was aware that the reorganization was not then final and there were other candidates for the job. Favorable treatment is not actionable under Title VII as sex discrimination. However, the district court went on to state that the " 'era of good feelings' created during Bendix's process of acquiring Jane Andre as an employee changed upon her arrival at the scene." *Id.* Thus we do not think the district court relied on the favorable hiring treatment in finding sex discrimination.

2. The district court found that Franz, Andre's competitor, was placed in the position of Manager of Manufacturing. 584 F.Supp. at 1505. Franz was selected for this position, but before Andre started work at Bendix, and Andre had been told during her interviews that Franz was also competing for a managerial position in manufacturing. Further, she had been told that the reorganization had not been approved by Bendix's corporate headquarters. We fail to see how the lateral transfer of Franz could support a finding of sex discrimination. It might, however, support an inference that Franz was aware that Andre was going to be considered for his position and had a motivation to try to prevent her from getting it.

3. Bendix challenges the district court's finding that the "network of Moore, Franz, Rideout, Luzney, Loutzenheiser and others appears to have been created over approximately 30 years at Bendix." 584 F.Supp. at 1505. We are uncertain what to make of this finding. Clearly, the named individuals had been at Bendix for a long time, and had worked together. But insofar as this is meant as a finding that there was some sort of conspiracy to get rid of Andre it is clearly erroneous. There is no evidence of a conspiracy or network. Further, the district court's finding that there appeared to have been "an effort, calculated or not, to reduce Jane Andre's ability to deal effectively with those reporting to her," 584 F.Supp. at 1506, could not support a finding of intentional sex discrimination because the court never found this effort to have been calculated, or to have to do with Andre's sex.

4. The district court found that Andre was given a *"de facto* demotion" even before she arrived. 584 F.Supp. at 1505. Andre was hired as a "Superintendent." Before she arrived the production supervisory classifications were reorganized. In each department there were now shift supervisors, one of whom was responsible for production during each of the three shifts, and a "general supervisor." Each shift supervisor reported to the general supervisor. Andre was a general supervisor. "General supervisors" appear to be functionally equivalent to "superintendents." Indeed, Paul Strasser, who had been a superintendent also became a general supervisor. He was, of course, male. He was kept as a "superintendent" for salary purposes, but his salary was comparable to that of the other general supervisors. Andre was also kept as a superintendent for salary purposes. However, she was paid $720 per month more than Strasser. Since Andre was treated better than the similarly situated male, this "demotion," if in fact it was such, could not support a finding of sex discrimination.

5. The court found that Andre was not given a private office, desk or phone upon arrival, although she "expected" such. How the fact that the general supervisors shared an office and phones should support a finding of sex discrimination is beyond us. The district court concluded that this was "a concrete demonstration of managerial unhappiness that Jane Andre had ever come to the Energy Controls Division." 584 F.Supp. at 1505. Even if this were true, there is no indication that the unhappiness had anything to do with her sex. Further, the fact that Andre was not listed in the company phone book when she was fired does not show discrimination but only disorganization, since there was no evidence newly hired male supervisors were listed more quickly.

6. The district court found that Franz was placing memos in Andre's file and neither he nor Rideout were telling her. 584 F.Supp. at 1506. This is true, but cannot raise or corroborate an inference of bias against Andre. The testimony was uncontradicted that Franz did this on a routine basis to all his employees. Rideout had responsibility for over 2000 employees and did not speak with each employee or even each supervisor who had a memo put in his or her file. She testified she would not have told Andre about the memos if Andre were male. However, the incidents underlying the memos Franz wrote and his handling of the incidents in the memos, might support an inference of bias, and will be discussed shortly.

7. The district court found that Andre's rebuttal memorandum of July 16, 1979, adequately responded to Franz's memos to her file. 584 F.Supp. at 1506. The court concluded that Franz's memos showed a refusal to deal with Andre as a colleague. *Id.* We agree that the two sets of memoranda show two at times sharply differing versions of the events. Franz's memos do not seem at all times to be fair. Andre's rebuttals show her to have frequently—but not always—acted aggressively against her subordinates without investigating the facts of the event. She wrote a memo to one of her supervisors accusing him of "needing a shot of male hormones" for rehiring a worker whom he had fired the day before. Pl. Ex. 5, p. 2. It turned out, however, that the Industrial Relations Department had required that the employee (a union steward) be reinstated; the supervisor had not backed down. At another point, Andre took a call for an hourly employee on the second shift. The call was from a high school teacher and concerned the employee's child. Andre determined that the call could be returned later. Somewhat misleadingly Franz's memo says Andre "questioned the emergency status" of the call, implying that the call was an emergency but that Andre would not allow the employee to take the call. Andre's message to the hourly employee shows her to have an aggressive managerial style. Franz's memo shows that he questions her action, not that he was discriminating against her because she was a woman. Pl. Ex. 6.

Another incident concerned whether Andre called an hourly employee a "fool" during a shouting match started by the employee. The employee complained to Franz, who summoned Andre to his office and asked her if she did call the employee a fool. She denied it. Franz took the word of the hourly employee, which was supported by that of another employee, over that of Andre. He wrote a memo to Andre's file which stated that this "normally would be considered 'shop talk,' but in view of the inflammatory relationship between Ms. Andre and the hourly, I consider this action another example of unacceptable supervision on her part." Pl. Ex. 4.

Franz also wrote a memorandum to Andre's file after a dispute over whether an injured hourly worker could work his usual job. Bobby Dean was a second shift worker who usually operated a machine which required two hands. In February, he had a cast on one arm, but wanted to work. Both Franz and Moore denied his request. Dean then approached Andre, without telling her he had already seen Franz and Moore. She said she would allow him to work. Before Dean started work Franz met with Andre, mentioned Dean's approaches to him, and discussed whether Dean should work. Franz said that Dean could work only if he had a doctor's permission, and instructed Andre to send Dean to the company doctor when Dean reported for work. Pl. Ex. 15, p. 10. Dean reported with a note, apparently from another doctor, and Andre let him work without sending him to the company doctor. The next day Franz told Andre that the company doctor did not want Dean to work. Dean and Andre phoned the company doctor, who told Andre that he thought Franz did not want Dean to work and so he, the doctor, had decided Dean should not work. *See* 584 F.Supp. at 1496. At that point Andre appears to have sent Dean home. Franz then wrote a memo to Andre's file stating that Andre did not check with the company doctor and used "unacceptable poor judgment" in allowing Dean to work. Pl. Ex. 7, p. 2.

These incidents may show that Franz refused to treat Andre as a colleague, as the district court found. But Andre was Franz's subordinate. Their respective versions of the incidents show that they differed over what happened and what was appropriate. But nothing shows this difference to be due to Franz discriminating against Andre because of her sex.

8. The district court also relied on an incident involving the handling of a union grievance in the second week of Andre's employment at Bendix. The grievance concerned whether union employees would be paid for parts produced by salaried research staff on a machine they were developing. Franz's claim is that he told her to refer the grievance to Industrial Relations but she did not do so. He wrote a memo to her file to that effect. Pl. Ex. 3. Andre claims that Franz first told her to refer the grievance but then accepted her proposal of a way to respond. She then carried out the steps of the proposed response, which was rejected by the union. She then referred the grievance to Industrial Relations, and was talking about something else with the union, which Franz mistakenly took to be a continued discussion of the grievance.

Shortly afterwards, Moore, Franz and Andre met to discuss the incident. Moore believed Andre had been asked by Franz not to answer the grievance, but she explained she had received his message too late and so could not have been insubordinate. Moore then tried to explain why it was so important to refer this type of grievance to Industrial Relations, but Andre interrupted him so repeatedly that he lost his temper and scolded her. Because of this scolding she didn't get a chance to make him understand her side of the story.

The district court apparently believed Andre's account of the handling of the grievance and Moore's account of the meeting. 584 F.Supp. at 1492–93. But the court thought that the grievance was minor and thus Moore's support of Franz for treating it as major showed that Moore treated Andre as difficult to get along with

and supported a finding of sex discrimination. 584 F.Supp. at 1505. We cannot agree that Moore's handling of the dispute could be support for a finding of sex discrimination. There is no evidence union disputes in which male supervisors were involved were evaluated differently by Moore.

9. The district court makes much of the application of the dress code to Andre. We find this emphasis erroneous. The dress code required "appropriate clothing." What clothing was appropriate is not specified. The record establishes that during the summer the hourly workers in Department 125 commonly wore tube tops, halter tops and colored u-neck undershirts (basketball type shirts). Both men and women wore these sleeveless shirts. All the male supervisors wore collared shirts with sleeves, though not with ties. Most wore sports shirts. Tr. 298. *Cf.* Tr. 224 (day shift supervisors wore white shirts and ties). The one female production supervisor who testified at trial, Nancy Bailey, stated that a sleeveless blouse would not be unacceptable so long as it had a collar and a seam of over two inches from collar to arm hole. She testified that a tube top with narrow rope straps such as Andre wore would not be appropriate for a female supervisor. Tr. 298–99, 303.

The district court found that Franz's ruling that Andre's tops were inappropriate was "based on Franz's preference that Jane Andre dress as the other male supervisors." 584 F.Supp. at 1506. That finding has support in the record. But it cannot support a finding of sex discrimination. The district court found the application to Andre discriminatory because "other women in the plant wore what she was wearing." *Id.* Andre *was* being singled out from the other women: they were hourly workers, she was a supervisor. She wanted to dress like the hourly workers, male and female; she was told to dress like the supervisors. She was a supervisor. The dress policy may have been unreasonable, given the heat in the department, but it was not discriminatory. *See Bellissimo v.*

*Westinghouse Electric Corp.,* 764 F.2d 175, 181 (3d Cir.1985) (Wisdom, J.).

It is true that when Andre resisted Franz's initial directive to change the top he fell back on a safety rationale. Andre correctly pointed out that such reasoning would apply to the hourly employees as well. (The testimony is inconclusive as to whether safety concerns would require the change in tops.) So the safety reason may be a pretext. But that does not show that asking Andre to dress appropriately (in this case like the male supervisors) was motivated by sex discrimination. Nor does it show that Andre was not being insubordinate by refusing to change.

10. Franz had Andre escorted out of the plant by two uniformed security guards. This was unusual. It may well have been humiliating, and would support a finding that Franz was hostile to Andre. This incident comes the closest of anything in the record to substantial support of the district court's finding of sex discrimination. Still, although the event seems bizarre, there is really nothing about it to support an inference that a similarly situated male would have been treated differently.

11. After Andre was fired, Bendix changed the termination to a suspension. (Franz had not followed company policy for summary termination.) The company then formed a review committee of Ted Moore, the man who had hired Andre, Jeanne Rideout, the female director of personnel, and W. Kunz, Director of Electronic Operations, who knew nothing about the preceding events. The committee reviewed Andre's file and her rebuttal memorandum. It affirmed the termination.

The consensus of the Committee was Ms. Andre did not possess the necessary people skills nor was making progress in the day to day supervision of her subordinates. She lacked good judgment in her relationship with subordinates and superiors. Her past welding experience in structural welding and circuit board soldering application was lacking on our specific application.

The decision of the Committee was Ms. Andre would be terminated due to inability to perform the duties of her position. Pl. Ex. 22. The letter to Andre notifying her of the committee's decision stated that termination was due to "inabilities to perform the duties of your position." Pl. Ex. 16. The district court disbelieved the reasons.

The committee's decision was based on the on-the-spot firing by Franz, its own experience, and a review of the memoranda in Andre's file, and her written rebuttal to those memoranda. The memos in her file were all written by Franz, with the exception of Moore's memoranda, some of which were based in part on what Franz had said to Moore. Thus the review committee in part took Franz's word over that of Andre. But Moore had interviewed Andre and dealt with her on numerous occasions during her employment at Bendix. From the beginning he had expressed doubts about her supervisory ability. There is absolutely no evidence that this scepticism was based on Andre's sex and not on her inexperience in production and her personality. There was plenty of evidence in the record before the committee to support its determination. Clearly, the reason given was not an after the fact pretext to cover up its own sex discrimination.

B.

We believe the evidence supports some of the district court's conclusions. "Andre was an outsider, a female, one who exceeded all of the ... [supervisory personnel] by the level of her education and the breadth of her experience," 584 F.Supp. at 1505, that she "was faced with widespread animosity and suspicion from the day she arrived at Bendix," id., and "that part of Franz's ... dislike of Jane Andre stemmed from the fact that she could respond to

[his] criticisms," 584 F.Supp. at 1506. We can agree that the record supports a finding of hostility between Franz and Andre, but this is only a finding of hostility. An "unfortunate and destructive conflict of personalities does not establish sexual discrimination." *Bellissimo v. Westinghouse Electric Corp.*, 764 F.2d 175, 182 (3d Cir. 1985) (Wisdom, J.).

The district court found that this hostility was due to Andre's sex and not due to her aggressive managerial style, relative overeducation and high salary, or that she and Franz were competitors for the proposed managerial position.[7] The district court did not specify any reasons in support of its choice. We believe the evidence points toward the latter factors as the more likely grounds for Franz's hostility. We have reviewed the record to determine if there is some basis for supporting the trial court's finding that this hostility was due to Andre's sex, but have been unable to locate any such support.

Franz himself testified that he believed that Andre was being challenged by the hourly workers more because she was a new female supervisor than she would have been if she were a new male supervisor. Tr. 175–76. Franz's memos seem always to side with the hourly worker and criticize Andre's handling of the challenge. *See esp.* Pl. Ex. 4. Further, Franz testified that in his "opinion a hard-line female in the working environment is much less apt to be accepted in the same counterpart as a male." Tr. 195. By "hard-line" Franz meant someone who adopted a "tough, profane, aggressive, direct authoritarian management style." Tr. 194. Franz himself admitted to adopting this style at times, and it seems clear from the record that Andre did as well.

7. Indeed, in her rebuttal memorandum Andre appears to attribute Franz's hostility to a fear that she might take his job. She wrote:

But it appears by now that all [Franz is] interested in doing is building a case against me in the interest of finding some excuse to discharge me to take me out of the superin-

tendent's position and to discredit me so that the company would have reason not to fulfill their promise to move me into the manufacturing manager's position, which was given to him.

Pl. Ex. 15, p. 1.

There was also testimony that there was animosity in the shop against Andre from the day she started, Tr. 226, though the testifying witness attributed this animosity to the fact that "everyone thought she was sent down here from the corporate office ... to take a job in the shop and find out just what was going on here," Tr. 215, and to her high salary, Tr. 216. The witness, Zack Teeter, stated that he had at one time told Andre that he didn't think she would last six months, but that he had subsequently changed his opinion and decided she was trying hard. Tr. 225–26.

Although there is no allegation that the discharge was retaliatory, we note that there was testimony that Andre hosted a small dinner meeting for other female Bendix employees to discuss the problems of working in a male-dominated field. Andre stated her beliefs and handed out a list of attorneys and agencies that specialized in sex discrimination suits. Not all the women in attendance agreed with Andre that the problems she described were due to sex discrimination and not due to her handling of the incidents described. Tr. 337–39. There is no indication Franz or Moore even knew about this meeting.

The reason given by the review committee was "inabilities to perform the duties of your position." This broke down into both technical and personality-based inabilities. The technical inability is somewhat undercut by the production figures for Department 125. The production figures for Department 125, both in terms of output and in terms of increased productivity measured as reduction in "L.E.D." (losses, errors and defects) was good, and indeed perhaps better than either before or after her tenure when others were supervising. *See* 584 F.Supp. at 1490 & n. 7; Def. Ex. A. Moore's suggestion that she go slow on production so as to ease work for the production workers does not sound very convincing. However, although there was testimony she was inquisitive and improving some procedures, there was also testimony that Andre was sometimes obstinate and frequently did not know what she was talking about.

In regard to the personality-based inabilities, we note that Moore had expressed doubts about her abilities to supervise, starting with his initial interview memo and continuing throughout Andre's employment. He had the company send Andre for "sensitivity training" in May 1979, to remedy this perceived inability to get along with her colleagues, subordinates and workers. We have no doubt that Moore was sincere, but some of his information came from his subordinate, Franz, who was Andre's direct supervisor. So we are once again back to the conflict between Franz and Andre. This conflict is evidenced in his memoranda to her file and her rebuttal memorandum. There is nothing to indicate this conflict was due to Andre's sex. Given Moore's longstanding doubts about Andre's capabilities, we believe the district court's finding that the review committee's termination was pretextual is clearly erroneous.

The district court believed Andre, and we are loath to find that credibility determination erroneous. Further, there can be little doubt that there was some sort of hostility or animosity between Franz and Andre, or at least that he had such toward her. But even given Andre's version of the incidents in question, and the objective evidence of the productivity of Department 125 under Andre's supervision, and even if we treat the action of the review committee in affirming the termination as pretextual, we still are unable to locate any evidence that could support a finding of sex discrimination. Apparently the district court had some sort of "hunch" that the hostility shown to Andre was based on her sex. Yet the district court did not articulate any basis for this "hunch," and we are unable to affirm the ultimate finding on the basis of the evidence upon which the district court did rely.

## IV.

Bendix's second argument is that it is entitled to a new trial because the district court violated the requirements of Rule 52(a) of the Federal Rules of Civil Procedure by adopting wholesale Andre's post-

trial brief as its findings of fact and conclusions of law. We agree with Bendix's conclusion, though not precisely for the reason it gives.

■■■ This circuit has no rule prohibiting a district court from adopting findings substantially or entirely as proposed by one party. *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 263 (7th Cir.1981) (collecting cases), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Norfolk & Western Ry. Co. v. B.I. Holser & Co.,* 629 F.2d 486, 489 (7th Cir.1980). Adoption of a party's proposed findings is left to the sound discretion of the trial court and is reviewed for abuse of discretion. *Lektro-Vend Corp.,* 660 F.2d at 263; *Scheller-Globe Corp. v. Milsco Manufacturing Co.,* 636 F.2d 177, 178 (7th Cir.1980). However, this court has recognized that where a district court adopts a party's proposed findings of fact wholesale or verbatim, the resulting findings are "not the original product of a disinterested mind." *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1284 (7th Cir.1977); *see Norfolk & Western Ry. Co. v. B.I. Holser & Co.,* 629 F.2d at 489. Thus, when a district court adopts a party's proposed findings of fact, "we examine the findings especially critically when deciding whether they are clearly erroneous." *Coates v. Johnson & Johnson,* 756 F.2d 524, 533 n. 7 (7th Cir.1985); *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 731 (7th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). Further, we have criticized district courts for adopting verbatim the proposed findings of a party. *Garcia v. Rush-Presbyterian-St. Luke's Medical Center,* 660 F.2d 1217, 1220 (7th Cir.1981). *See, e.g., Machlett Laboratories, Inc. v. Techny Industries, Inc.,* 665 F.2d 795, 797 & n. 4 (7th Cir.1981); *Scheller-Globe Corp. v. Milsco Manufacturing Co.,* 636 F.2d at 178; *FS Services, Inc. v. Custom Farm Services, Inc.,* 471 F.2d 671, 676 (7th Cir.1972). Despite this criticism, the district court below has engaged in the practice. *Norfolk & Western Ry. Co. v. B.I. Holser & Co.,* 629 F.2d at 489; *City of Mishawaka v. American Electric Power Co.,* 616 F.2d 976, 979–80 (7th Cir.1980), *cert. denied,* 449 U.S.

1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981). We have vacated district court actions when the adopted findings were inadequate to support the court's action. *Machlett Laboratories, Inc. v. Techny Industries, Inc.,* 665 F.2d at 796–98.

The district court here adopted verbatim approximately 54 out of 55 pages of Andre's post-trial brief as its findings of fact. This includes footnotes, citations and spelling and typographical errors. One particularly noteworthy (and, we suspect, embarrassing) result of this wholesale adoption is that the district court cites throughout its analysis to numbered "Facts" which are not contained in its decision. *See* 584 F.Supp. at 1505–07. Andre had used that term in her post-trial brief to refer to her separate "Proposed Findings and Conclusions," App. 121–28, which the district court did not adopt. The court neglected to take the trouble to key its analysis to Andre's post-trial brief statement of facts which it had adopted (in lettered sections) as its findings of fact.

On the other hand, Andre has pointed out some 94 places where the district court made changes in her post-trial brief before it adopted that as its findings and conclusions. *See* Supp.App. 42–45. These changes range from corrections of typographical errors to addition or deletion of whole paragraphs. The vast majority of the changes are deletions ranging from a few words to a few sentences. Given this large number of editorial alterations, we are at least certain that the district court read the post-trial brief before adopting it. *Cf. Machlett Laboratories, Inc. v. Techny Industries, Inc.,* 665 F.2d at 797 & n. 4 (vacating preliminary injunction where district court did not read proposed findings of fact it entered as its own). Our concern, therefore, is not so much with the *manner* in which the district court adopted the proposed findings, as with the *adequacy* of the findings which resulted from this adoption.

One of the more important purposes of the Rule 52(a) requirement that a district court make findings of fact is to "aid review by affording a clear understanding of the ground or basis of the decision." *Wattleton v. International Brotherhood of*

*Boiler Makers, Local No. 1509*, 686 F.2d 586, 591 (7th Cir.1982), *cert. denied,* 459 U.S. 1208, 103 S.Ct. 1199, 75 L.Ed.2d 442 (1983). Indeed, this circuit has held that substantial compliance with the fact-finding requirements of Rule 52(a) necessitates that the findings of fact on the merits include as many of the subsidiary facts as are necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.

*Denofre v. Transportation Insurance Rating Bureau,* 532 F.2d 43, 45 (7th Cir. 1976) (per curiam). *See Mozee v. Jeffboat, Inc.,* 746 F.2d 365, 370 (7th Cir.1984); *Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir. 1982). Once a Title VII trial has progressed to the ultimate issue—whose explanation of motive to believe—"the only subsidiary finding necessary [under Rule 52(a)] is what facts persuade the court to prefer one party's version." *Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 136 (7th Cir.1985).

Clearly, the district court found sex discrimination because, ultimately, it believed Andre and did not believe Franz. But "the trial judge may [not] insulate his findings from review by denominating them credibility determinations." *Anderson v. City of Bessemer City,* 470 U.S. at —, 105 S.Ct. at 1512. We reviewed the evidence and the findings predicated on them in Part III and were unable to locate any rational or articulated reason by which the ultimate finding of sex discrimination could be supported. Although the court correctly stated the law it was applying, we were not able to follow the district court's reasoning. Because "[t]he district court ... made the necessary ultimate finding that there was ... discrimination, but it failed to make the subsidiary findings necessary for us to follow its chain of reasoning," *Mozee v. Jeffboat, Inc.,* 746 F.2d at 370, this case is much like *Mozee v. Jeffboat, Inc.,* where we remanded for a new trial, even though the district court here did not ignore whole categories of evidence.

■ Where the district court's findings are inadequate for meaningful appellate re-

view because we are unable to follow its reasoning, we have sometimes simply remanded to the same judge for further findings (or proceedings if necessary), *e.g., Denofre v. Transportation Insurance Rating Bureau,* 532 F.2d at 45, but more recently and more frequently we have remanded for a new trial before a different judge, *e.g., Rucker v. Higher Education Aids Board,* 669 F.2d at 1184 (trial ended more than one year prior to appeal so record might be stale in trial judge's mind); *Mozee v. Jeffboat, Inc.,* 746 F.2d at 370 & n. 6 (first trial judge deceased during pendency of appeal). *See also* 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2577 (1971) (appellate court may, due to inadequate findings, order a new trial). Because we are unable to follow the district court's chain of reasoning from hostility to sex discrimination and are unable either to affirm the finding of sex discrimination or to determine that the finding of hostility is clearly erroneous, we will remand this case for a new trial.

For the reasons given above, the judgment of the district court is VACATED and the case REMANDED for a new trial. Circuit Rule 18 shall apply. Each party shall bear its own costs.